In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 10-3725, 10-3726, 11-2262 & 11-2439

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MONTREECE KINDLE, NATHAN WARD,
DWAYNE WHITE and LESLIE MAYFIELD,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 09 CR 687—**Harry D. Leinenweber,** *Judge.*

ARGUED MAY 30, 2012—DECIDED SEPTEMBER 26, 2012

Before EASTERBROOK, *Chief Judge*, and BAUER and POSNER, *Circuit Judges*.

BAUER, *Circuit Judge*. This case represents the consolidated appeal of four defendants charged with, among other crimes, conspiring to steal cocaine from a fictitious drug "stash house." The defendants all pleaded not guilty, and they were all convicted on the same four counts: conspiracy to possess with intent to distribute five

or more kilograms of cocaine in violation of 21 U.S.C. § 846 ("Count One"); attempted possession with intent to distribute five or more kilograms of cocaine in violation of 21 U.S.C. § 846 ("Count Two"); possession of four firearms during and in relation to a drug trafficking offense in violation of 18 U.S.C. § 924(c)(1)(A) ("Count Three"); and possession of a firearm after previously having been convicted of a felony in violation of 18 U.S.C. § 922(g)(1) ("Count Four"). The defendants appeal various aspects of their convictions and sentences.

## I. BACKGROUND

This case began with an undercover sting operation carried out by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF); apparently, the ATF has a standard playbook for such operations, and the facts between cases are frequently nearly identical.[1] The ATF had a confidential informant named Jeffrey Potts (not an ATF agent himself) who shared a workplace with one of the defendants, Leslie Mayfield. Potts' role was to funnel parties interested in armed robberies to an under-cover ATF agent, for which the ATF would pay Potts a fee. Someone—either Potts or Mayfield—brought up the possibility of robbing a drug "stash house." Potts

---

[1] See, for example, *United States v. Lewis*, 641 F.3d 773, 777 (7th Cir. 2011) (describing a similar set of facts as "a rather shopworn scenario in this court"); *United States v. Blitch*, 622, F.3d 658, 661 (7th Cir. 2010); *United States v. Corson*, 579 F.3d 804, 806-09 (7th Cir. 2009).

referred Mayfield to undercover ATF Agent Dave Gomez. A meeting was arranged for July 23, 2009, among Mayfield, Potts, and Gomez.

At the July 23 meeting, Agent Gomez pretended to be a disgruntled courier for a Mexican drug cartel; the ATF's hidden recording devices captured this and future meetings of Gomez and the defendants. Gomez laid out an initial plan for a stash-house robbery. He explained that he ran a shipment of about 6 to 8 kilograms of cocaine to an unidentified location every month. He claimed that the location—the stash house—always contained about 20 to 30 kilograms of cocaine in addition to the quantity he delivered. No such stash house actually existed, of course; Gomez was following the standard playbook for ATF sting operations of this kind. Gomez told Mayfield that there were usually about three armed guards inside the stash house when he made his delivery, and that he needed an outside crew to assist him to rob the house. Mayfield asked several logistical questions. He wanted to know, for example, how a crew could break into the house and where in the room the three guards were usually situated. Mayfield ultimately expressed interest in carrying out the robbery. He told Gomez that he would assemble his people and agreed to meet later with the full team present to hash out the plan.

Prior to the second meeting, there was a phone call between Mayfield and Gomez. During their short conversation, Mayfield confirmed the meeting for the following day and indicated an immediate need to move

some drugs; specifically; he said that he would be interested in dealing cocaine with Gomez prior to the planned robbery.

The parties reconvened on August 9, 2009, this time with a full robbery crew present. And again, they were all being recorded. Mayfield, Montreece Kindle, Nathan Ward, and an unidentified fourth individual[2] all met with Gomez to discuss the stash-house robbery. Gomez described the setup once again, including the part about three armed guards in the stash house. Mayfield and Kindle pressed Gomez on specifics, such as how long he was usually present in the stash house for his pickups and whether the person answering the door was ever armed. Mayfield stressed the importance of the element of surprise, and Kindle indicated that they might have to kill the stash-house guards. The parties eventually turned to post-robbery plans, and discussed how they would divvy up the shares of cocaine. Ward in particular noted that the shares should be divided five ways, evenly. The parties discussed some more logistics and eventually agreed to reconvene on the day of the robbery.

Gomez contacted Mayfield to inform him that the stash-house delivery would occur at a location in Naperville, Illinois on August 10, 2009. On that day, Gomez met Mayfield and his team, which now included Dwayne

---

[2] This fourth individual, known only as "New York," would later disappear from the crew and is not otherwise implicated in this appeal.

White in addition to Kindle and Ward. Mayfield asked where the team would go after pulling off the robbery, and Gomez responded that he could show the team where they would be storing the stolen cocaine. Mayfield agreed, telling his crew to follow Gomez in a brown van to the storage site. Mayfield rode in Gomez's vehicle and, during the short trip, they reviewed the robbery plans. After everyone arrived at the supposed storage site, they exited their vehicles; Gomez noticed for the first time that White was new to the crew. Gomez sought and received assurances that White knew what was going down. White sought confirmation that there would be weapons inside the stash house. Finally, having surveyed the storage facility, the members of Mayfield's team indicated their readiness to proceed with the robbery; Gomez gave a signal, and federal authorities descended on the party, arresting the defendants.

After the arrest, federal agents searched the crew's van. They found several weapons (including a sawed-off shotgun), ski masks, ammunition, bullet-proof vests, latex gloves, and a duffel bag suitable for carrying a large amount of drugs. An agent also recovered a ski mask directly from White's pocket. Kindle waived his *Miranda* rights and gave a statement to the authorities, implicating himself and the others in the conspiracy to rob the fictitious stash house.

All defendants pleaded not guilty and proceeded to a jury trial. Mayfield, White, and Ward were tried together, charged with the same four crimes. Kindle was

charged with the same crimes, but was tried separately because of his post-arrest statement that implicated the others. All defendants were found guilty of the following crimes: conspiracy to possess with intent to distribute five or more kilograms of cocaine in violation of 21 U.S.C. § 846 ("Count One"); attempted possession with intent to distribute five or more kilograms of cocaine in violation of 21 U.S.C. § 846 ("Count Two"); possession of four firearms during and in relation to a drug trafficking offense in violation of 18 U.S.C. § 924(c)(1)(A) ("Count Three"); and possession of a firearm after previously having been convicted of a felony in violation of 18 U.S.C. § 922(g)(1) ("Count Four").

## II. DISCUSSION

The defendants have mounted several challenges on appeal. Mayfield, White, Ward, and Kindle all challenge the sufficiency of the evidence under Counts One and Two; White also challenges the sufficiency of the evidence under Count Three. Mayfield argues that the district court erred when it denied him the right to present an entrapment defense; he also challenges his sentence of 322 months. Ward's counsel filed an *Anders* brief and seeks to withdraw her representation; Ward responded. We deal with each of these issues in turn.

## A. Challenges to the Sufficiency of the Evidence

All of the defendants challenge the prosecution's evidence on various counts, arguing that it was insufficient

to prove their guilt beyond a reasonable doubt. They face a "formidable hurdle" with this argument. *See United States v. Dennis*, 115 F.3d 524, 534 (7th Cir. 1997). When considering a challenge to the sufficiency of the evidence, we construe the record "in the light most favorable to the prosecution, making all reasonable inferences in its favor, and affirm the conviction so long as any rational trier of fact could have found the defendant to have committed the essential elements of the crime." *United States v. Mota*, 685 F.3d 644, 649-650 (7th Cir. 2012) (quoting *United States v. Vallar*, 635 F.3d 271, 286 (7th Cir. 2011)). Overturning a guilty verdict for lack of evidence is serious business; we are essentially asked to take the case out of the jury's hands, something we will do "only if the record contains no evidence, *regardless of how it is weighed*, from which the jury could find guilt beyond a reasonable doubt." *Mota*, 685 at 650 (emphasis added) (quoting *United States v. Fassnacht*, 332 F.3d 440, 447 (7th Cir.2003)).

### 1. Evidence for Count One

All defendants challenge the sufficiency of the evidence for their guilty verdicts under Count One, conspiracy to possess cocaine with intent to distribute. *See* 21 U.S.C. § 846. To establish the conspiracy, the government had to prove: (1) the existence of an agreement between 2 or more persons to possess with intent to distribute cocaine; (2) that the defendant knew of the agreement; and (3) that the defendant intended to join the agreement. *United States v. Spagnola*, 632 F.3d 981, 986 (7th Cir. 2011).

Put simply, the Government presented a mountain of evidence against these defendants to prove that they agreed with each other to steal cocaine. We needn't detail each piece of evidence produced at the trials; suffice to say, the Government was able to use the defendants' own words against them because of the extensive recordings of conversations with Agent Gomez. Additionally, Kindle waived his *Miranda* rights at the time of his arrest and made statements that were used at trial. And of course, a wealth of physical evidence was seized from the brown van that the defendants planned to use for the robbery. Keeping in mind that we view these factors in the light most favorable to the Government, a rational jury could easily find that the defendants agreed with each other to steal cocaine.

But the real gist of the defendants' argument is that even if there was a conspiracy between them to steal cocaine, there was no evidence of an intent to distribute it, a required element under Count One. We have encountered this argument before in contexts very similar to this one, and we have rejected it. *See, e.g., United States v. Walker*, 673 F.3d 649, 654-55 (7th Cir. 2012) (rejecting a lack-of-evidence-to-distribute argument in another case involving the planned robbery of a fictitious stash house); *United States v. Lewis*, 641 F.3d 773, 782 (7th Cir. 2011) (same).

As we explained in *Lewis*, 641 F.3d at 782, there are several permissible inferences a reasonable jury could draw from the type of evidence presented here. First, the plan was to rob a stash house containing a large

amount of cocaine (probably somewhere between 25 and 35 kilograms). Law enforcement officials at trial testified that 25 to 35 kilograms of cocaine is not a personal-use amount, and the jury could reasonably infer that given the sizeable quantity, Mayfield and his crew intended to distribute it. Additionally, recordings of the conversations between Gomez and the robbery crew suggest that the stakes were high in this operation; the crew members demonstrated a preoccupation with how to deal with the armed guards in the fictional stash house, and at one point Kindle even suggested that they would kill the guards. Indeed, the weapons found in the van showed that the crew meant business. A jury could infer that, given the huge risk the defendants planned on exposing themselves to, they must have expected an equally huge reward. Such a reward would require distribution.

In short, the jury had ample reason for finding that the defendants intended to distribute whatever amount of cocaine that they expected to recover.

### 2. Evidence for Count Two

The defendants next challenge the sufficiency of the evidence for a conviction under Count Two, the crime of attempting to possess cocaine with intent to distribute. *See* 21 U.S.C. § 846. (Although the wording of Counts One and Two are highly similar, "conspiracy" and "attempt" are two separate criminal offenses.)

To prove attempt, the Government had to show not just that the defendants acted with the intent to possess the

cocaine, but also that the defendants took a "substantial step" toward possessing it. *See United States v. Dennis*, 115 F.3d 524, 534-35 (7th Cir. 1997). A substantial step is "something more than mere preparation, but less than the last act necessary before the actual commission of the substantive crime." *United States v. Barnes*, 230 F.3d 311, 315 (7th Cir. 2000) (citing *United States v. Rovetuso*, 768 F.2d 809, 821 (7th Cir. 1985)). To qualify as substantial, the step "must be of such a nature that a reasonable observer viewing it in context could conclude beyond a reasonable doubt that it was undertaken in accordance with a design to violate the statute." *Barnes*, 230 F.3d at 315.

Here, Mayfield, Kindle, and Ward attended a meeting prior to the planned robbery to discuss their plans in detail with Gomez and each other. Mayfield and Kindle asked logistical questions and Ward commented on how he thought the drugs should be divided. We have previously noted the importance of conversations like these in establishing a substantial step for a showing of attempt. *See, e.g., United States v. Magana*, 118 F.3d 1173, 1198-99 (7th Cir. 1997); *United States v. Wilks*, 46 F.3d 640, 645 (7th Cir. 1995). Those cases involved attempted drug sales rather than an attempted stash-house robbery, but the planning involved is similar to that which occurred in this case.

The Government's strongest evidence of a substantial step came on the day of the planned robbery. All four of the defendants, now including White, met Gomez in their brown van and indicated their readiness to pro-

ceed with the robbery. They still didn't know the exact location of the stash house, but that doesn't matter.[3] They arrived armed with an assortment of guns, ski masks, and other implements for a robbery. They even followed Gomez in their brown van to the site where they planned to store the drugs after the robbery. Further, although White was relatively new to the group, he confirmed with Gomez that he knew the plan, and authorities recovered a ski mask from his pocket.

The defendants rely heavily on *United States v. Cea*, 914 F.2d 881 (7th Cir. 1990), in their effort to downplay their steps toward attempt. In *Cea*, we overturned a finding of attempt because there was not ample evidence of a substantial step to purchase drugs; specifically, the authorities botched the investigation by arresting Cea too soon (as soon as he left his house). The Government then failed to produce any evidence at Cea's trial to show that the defendant left his house intending to meet his drug dealer. There was nothing to show that the defendant knew where to meet with his dealer or whether he even had the money required to purchase the drugs. In this case, the evidence

---

[3] Mayfield appears to argue that because there was no known stash-house location—and perhaps because the stash house was fictitious to begin with—he cannot be found guilty. Although the argument is not altogether clear, we assume he means that he cannot be found guilty of attempting to rob a place that doesn't exist. This would be wrong; impossibility is not a defense to the crime of attempt. *See United States v. Mannava*, 565 F.3d 412, 416 (7th Cir. 2009).

showed that the defendants all took several steps beyond leaving their houses. They met with Gomez on the day of the planned robbery after Gomez claimed to have learned the location of the stash house. They spoke of their readiness to proceed with the imminent robbery. And of course, they carried with them the implements needed to carry out a crime. We will not overturn the jury's finding of attempt; the steps taken toward the attempt to possess here were myriad and, taken together, quite substantial.

### 3. Evidence for Count Three

White is the only defendant who argues for a reversal on Count Three, possession of firearms during and in relation to a drug trafficking offense. We needn't linger on this. White's argument for insufficient evidence on Count Three is premised on there being insufficient evidence for his conviction under Count One, which constitutes the underlying drug trafficking offense. Having explained in detail why there was ample evidence for White's conviction on Count One, we are also satisfied that there was enough to convict him on Count Three. His conviction under Count Three stands.

### B. Mayfield's Entrapment Defense

Mayfield argues that the district court erred when it granted the Government's motion *in limine* to preclude an entrapment defense. We have held that a court may bar a defendant from arguing entrapment at the

pretrial stage if the defendant's evidence of entrapment is insufficient as a matter of law. *See United States v. Johnson*, 32 F.3d 304, 307 (7th Cir. 1994). We review the district court's decision in this matter *de novo*. *United States v. Hall*, 608 F.3d 340, 343 (7th Cir. 2010).

To have an entrapment defense, Mayfield needed to show both that the Government induced him to commit a crime and that he was not otherwise predisposed to commit that crime. *See United States v. Millet*, 510 F.3d 668, 675-76 (7th Cir. 2007). We emphasize that Mayfield had the initial burden of proof on both of these issues. *Id*. at 675. Because we find that he failed to provide adequate evidence that he was not predisposed, we need not address inducement. In determining whether a defendant was predisposed to commit the crime at issue, we consider the following factors: (1) the defendant's character or reputation; (2) whether the government initially suggested the criminal activity; (3) whether the defendant engaged in the criminal activity for profit; (4) whether the defendant evidenced a reluctance to commit the offense that was overcome by government persuasion; and (5) the nature of the inducement or persuasion by the government. *Id*. at 676 (citing *United States v. Blassingame*, 197 F.3d 271, 281 (7th Cir. 1999)). No one factor is dispositive, but it is the fourth factor that carries the most weight. *Millet*, 510 at 676.

The Government proffered a wealth of evidence that Mayfield had a criminal reputation, including reference to his several prior convictions for crimes such as burglary, armed robbery, and armed vehicle hijacking.

Mayfield tried to counter this with evidence that he had been working hard, had received several certificates of professional achievement, and had been trying to get his life back on track, but his own words betray his supposed honest intentions. In extensive recorded conversations with Gomez, Mayfield described his past stash-house robberies in detail, and never seemed shy about embarking on a new criminal venture. He also expressed a desire to do a drug deal with Gomez before the robbery had even been fully planned. These conversations certainly do not reveal any sort of reluctance on the part of Mayfield; the first and fourth factors above weigh heavily against a lack of predisposition.

Mayfield counters that it was not Gomez but instead the confidential informant for the ATF, Potts, who pressured him into a crime he was not predisposed to commit. Potts worked with Mayfield and was the first person, according to Mayfield, to suggest a stash-house robbery. But how the informant "pressured" Mayfield is not entirely clear; Mayfield claims the informant showed him a gang tattoo, and that this somehow amounted to duress. There is no allegation of a more specific threat. It seems an odd notion that Mayfield could be bullied into something that he did not already want to do. Not only does he have a reputation for committing serious criminal acts, he was able to quickly assemble a team of friends (we refer to the co-defendants) who were all prepared to walk into a guarded drug house with him, guns blazing. That is not typically the sort of person who wilts at the suggestion of a gang affiliation.

One thing that weighs in Mayfield's favor is his claim that Potts approached him first about the stash-house job, and then repeatedly after that. But Government solicitation alone does not entitle a defendant to an entrapment defense. *See United States v. Perez-Leon*, 757 F.2d 866, 872 (7th Cir. 1985). We cannot find that Mayfield was not predisposed to commit the crimes when approached by the ATF. There was thus no error in the district court's decision to bar Mayfield from arguing entrapment.[4]

---

[4] The dissent believes that Mayfield was entitled to an entrapment defense. It argues that a jury could have found the government inducement "extraordinary," because stash-house robberies are particularly lucrative compared to other sorts of robberies. The dissent reasons that the inducement would only be extraordinary to a non-veteran stash-house robber, and that it was for the jury to decide if Mayfield had robbed stash houses before. We cannot endorse this analysis. It effectively collapses the inducement and predisposition elements of entrapment and would allow otherwise predisposed criminals to claim entrapment simply because they were entering a new, more lucrative field of crime. Whether a government agent's offer is extraordinary should be considered in light of the terms on which crimes of this sort are typically committed. *See United States v. Pillado*, 656 F.3d 754, 765 (7th Cir. 2011). Nothing in the record suggests that this planned stash-house robbery would be any more lucrative than the typical stash-house robbery. And as we stressed previously, the risk-adjusted rewards for this crime were not so great; Mayfield planned to risk his life and to risk prosecution for murder if he lived.

### C. Mayfield's Sentence

The district court sentenced Mayfield to 322 months in prison. This was based on an offense level of 34 under the Sentencing Guidelines, triggered because the judge found that the offense involved between 15 and 50 kilograms of cocaine. U.S.S.G. § 2D1.1(c)(3). The district court then applied a two-level enhancement to Mayfield's sentence because it found that he obstructed justice by committing perjury at trial. U.S.S.G. § 2D1.1(b)(14)(D). Mayfield now challenges both the calculation of his base offense level and the two-level enhancement for obstruction of justice.

We review a district court's factual findings about drug quantities for clear error. *United States v. Longstreet*, 567 F.3d 911, 924 (7th Cir. 2009). We also review for clear error a finding that a defendant committed perjury. *United States v. Spagnola*, 632 F.3d 981, 988 (7th Cir. 2011). To find clear error, we must be "left with a definite and firm conviction that a mistake has been committed." *United States v. Panaigua-Verdugo*, 537 F.3d 722, 724 (7th Cir. 2008). Finally, we review *de novo* the adequacy of the district court's explanation of his findings. *United States v. Sheikh*, 367 F.3d 683, 686 (7th Cir. 2004).

### 1. The Base Offense Level Calculation

For sentencing purposes, Mayfield is responsible for whatever amount of cocaine he knew (or should have known) was the object of his conspiracy. *See United States v. McKenzie*, 656 F.3d 688, 691 (7th Cir. 2011). If the

amount was 15 or more kilograms, a base offense level of 34 was appropriate. U.S.S.G. § 2D1.1(c)(3).

At trial, the primary thrust of Mayfield's defense was that he had actually teamed up with Potts to steal cocaine from Gomez, and that he never really intended to rob any stash house. Recall that Gomez claimed to transport only about 6 to 8 kilograms of cocaine every month. Because Gomez was his sole target, Mayfield argues that he never thought to recover an amount larger than 8 or so kilograms of cocaine, and so he does not meet the 15-kilogram minimum requirement for a base offense level of 34 under the Guidelines. This defense has gaping holes; it seems nonsensical that an ATF informant (Potts) would hatch a scheme to rob an undercover ATF agent (Gomez) of a quantity of drugs that never really existed. It also strains credulity to imagine how Mayfield could have agreed with Potts to rob Gomez without explaining the real plan to his co-defendants.

Sure enough, the jury rejected Mayfield's version of events. We know the jury rejected it because Mayfield was convicted of conspiracy, which required a finding of an agreement with his co-conspirators—and conspiracy is legally impossible by agreement with a government informant (like Potts) alone. *See United States v. Duff*, 76 F.3d 122, 127 (7th Cir. 1996). The jury was properly instructed on this rule of law: "A defendant cannot enter into an agreement solely with, or join a conspiracy solely with, confidential informant Jeffrey Potts or undercover agent David Gomez." Thus, it is disingenuous for Mayfield to argue that the jury never

rejected his defense about an agreement with Potts to rob Gomez. They necessarily rejected it when they found him guilty of conspiracy.

In robbing the fictitious stash house, then, how much cocaine did Mayfield expect to gain? There is sufficient evidence that he expected to recover more than 15 kilograms. In several conversations between Gomez and Mayfield, Gomez referred multiple times to an amount of at least 20 kilograms of cocaine stored in the house. Mayfield never said anything to indicate he thought there would be a lesser amount. So there was sufficient evidence for the district court to find that Mayfield met the 15-kilogram minimum for a base level calculation of 34.

But Mayfield argues that, even if there was sufficient evidence, the district court failed to state adequate grounds for its finding. We have held that, at sentencing, "a court must make an explicit finding as to the drug quantity and offense level and how it arrived at the sentence." *United States v. Fudge*, 325 F.3d 910, 920 (7th Cir. 2003). The district court did not run afoul of this rule.

First, the judge acknowledged having reviewed the Presentence Investigation Report (PSR), which detailed the amount of drugs implicated in the offense and provided Guidelines suggestions. The judge also heard both parties present their arguments; Mayfield's attorney basically re-hashed the same implausible defense presented at trial about a supposed agreement with Potts to rob Gomez of 6 to 9 kilograms. When Mayfield's attorney finished, the district judge stated, "Okay. All right.

I agree that the 6 to 9 was what Mr. Mayfield testified his intention [was], but the jury didn't buy it, and frankly I really didn't buy it either, . . . so I'm going to find that it's 34." The only evidence Mayfield had of the 6 to 9 kilogram amount was his own testimony at trial; no other evidence supported his contention that he had made a secret agreement with Potts to steal that amount. So we are satisfied that by explicitly rejecting this argument, and by acknowledging the PSR suggestions, the judge adequately explained how it arrived at the base offense level.

In sum, we find no clear error in the district court's sentencing Mayfield at a base offense level of 34.

### 2. The Two-Level Enhancement for Obstruction of Justice

The district judge ordered a two-level enhancement of Mayfield's sentence for obstruction of justice because he found that Mayfield perjured himself at trial. U.S.S.G. § 2D1.1(b)(14)(D). Specifically, the judge found that Mayfield lied about his plan to rob Gomez, stating,

> [Mayfield] testified, which would have been a defense to the indictment. Now, he testified that he committed a different crime or he intended to commit a different crime, but it was a defense, and the jury didn't buy it, so it's clear that—in my mind, anyway—that he did not testify truthfully, so I'm going to enhance two for that.

For the enhancement to stand, the defendant must have wilfully provided false testimony about a material

matter. *United States v. Johnson*, 612 F.3d 889, 893 (7th Cir. 2010). Mayfield argues that his testimony was not false and that it did not even concern a matter material to the case.

First, materiality. There is no doubt that the subject on which Mayfield testified—who he planned to steal from—was material. It went to the heart of the case. We have already explained that if jurors had accepted his testimony, they could not have found him guilty of conspiracy, since it is legally impossible to conspire with a government informant alone. So any false testimony on the subject was certainly material.

Likewise, we needn't linger on whether the testimony was false. For reasons we have already discussed at length, Mayfield's defense about a secret plan with Potts to rob Gomez was full of holes. His story directly conflicted with the testimony of others and with the recordings that suggested a conspiracy to rob the fictitious stash house.

But we are not quite finished, because Mayfield also claims the judge failed to adequately explain a finding of perjury. It is true that to apply an enhancement for obstruction of justice, "the district court must make independent findings necessary to establish all of three factual predicates for a finding of perjury." *United States v. Savage*, 505 F.3d 754, 763 (7th Cir. 2007). But this requirement is not as stringent as Mayfield suggests. We have only reversed obstruction enhancements for inadequate findings when the sentencing judge presented a bare-bones explanation, such as, "I thought your testimony

was riddled with inaccuracies and lies." *United States v. McGiffen*, 267 F.3d 581, 591 (7th Cir. 2001). Such a thin explanation leaves a defendant with a very poor idea of how exactly he perjured himself.

So although some specificity is required at sentencing, "separate findings are not strictly necessary so long as the court determined that the defendant lied to the judge and jury about matters crucial to the question of the defendant's guilt." *United States v. White*, 240 F.3d 656, 662 (7th Cir. 2001). And that is exactly what the court did in this case. The judge clearly stated that the perjury involved Mayfield's defense, and as we have already noted, that defense went to the heart of Mayfield's case; it dealt directly with the question of his guilt. We thus find no error in the two-level enhancement for obstruction of justice.

### D.  Ward and the *Anders* Brief

Ward's attorney filed an *Anders* brief in his appeal, requesting to withdraw because the appeal presents no non-frivolous issue. *See Anders v. California*, 386 U.S. 738 (1967). One of the potential appealable issues his attorney identified—the sufficiency of the evidence for convictions on Counts One and Two—we have already considered and rejected. Ward made further arguments in his response to the *Anders* brief that are wholly without merit. We agree with counsel that there are no remaining non-frivolous issues for appeal.

### III. CONCLUSION

For the aforementioned reasons, we AFFIRM the convictions of Mayfield, White, and Kindle, AFFIRM Mayfield's sentence, GRANT Ward's counsel's motion to withdraw and DISMISS Ward's appeal.

POSNER, *Circuit Judge*, concurring and dissenting. I join the court's opinion affirming the convictions and sentences of Kindle and White. But Mayfield is entitled to a new trial. A reasonable jury could find that he had been entrapped, and so the district judge should have instructed the jury on entrapment rather than barring the defendant from presenting an entrapment defense.

The defense is unusual. Ordinarily the burden of persuasion with respect to an affirmative defense is on the defendant. But if the defendant persuades the district court that a reasonable jury could find that he had been entrapped, the judge must submit the defense to the jury with an instruction that, to convict, the jury must find beyond a reasonable doubt that the defendant was *not* entrapped. *Jacobson v. United States*, 503 U.S. 540, 549 (1992); *United States v. Pillado*, 656 F.3d 754, 763 (7th Cir. 2011). There was enough evidence of entrapment in this case to require the judge to give such an instruction.

We should distinguish among three cases in which the police create an opportunity for someone to commit a crime and he does so. I will illustrate with bicycle theft. In case number one, a man is a known bicycle thief or strongly suspected of being one. The police place an unlocked bicycle in an area known to be frequented by him. Sure enough he sees the bike, sees that it's unlocked, rides off on it—and is promptly arrested by police officers who had been watching the bicycle, unobserved, from afar. In such a case there is no entrapment. The police arranged for the suspect to commit his usual crime, only in circumstances in which it would be easy to apprehend and convict him. "It would be a case in which the government had merely furnished the opportunity to commit the crime to someone already predisposed to commit it . . . . The government's inducement affects the timing of the offense; it does not create the offense by exploiting the susceptibilities of a weak-minded person." *United States v. Hollingsworth*, 27 F.3d 1196, 1203 (7th Cir. 1994) (en banc). "[T]he inducement which brought about the actual offence was no more than one instance of the kind of conduct in which the accused was prepared to engage; and the prosecution has not seduced an innocent person, but has only provided the means for the accused to realize his preexisting purpose." *United States v. Sherman*, 200 F.2d 880, 882 (2d Cir. 1952) (L. Hand, J.).

In case number two, a man is known to the police to have been a bicycle thief, but that was years ago and he's gone straight and become respectable. But they want an easy conviction so they arrange an extraordinary inducement. Pretending to be bicycle thieves they tell him

they'll pay him $1,000 to help them steal a bike that they describe as unusually valuable. He agrees. He had never made a profit of more than $50 per bike when he was a bicycle thief. And he needs money because, given his criminal record, he has been unable to obtain a job that pays a decent wage. The police stage the theft and then arrest him. That is entrapment. *Jacobson v. United States*, *supra*, 503 U.S. at 553-54; *United States v. Hollingsworth*, *supra*, 27 F.3d at 1199-1200. He would not, as far as anyone knows, have ever committed another bicycle theft had the police not confronted him with an opportunity far more lucrative than any he had encountered in his now abandoned criminal career. The police have thus caused an increase in the number of bicycle thefts, whereas in the first case they reduced the number of bicycle thefts by terminating a bicycle thief's career, though it would be more accurate to say that the sting in the first case *may well have* reduced the number of bicycle thefts; the reason for the qualification is that once the thief is taken out of circulation some formerly law-abiding person may decide to fill the resulting gap in the ranks of bicycle thieves.

In case number three, the police know the man has stopped stealing bikes only out of fear of being caught, and hence that he remains "predisposed" to steal bikes if circumstances improve. So they arrange the same type of sting as in case number two, rightly confident that even if he'd given up stealing bikes he can be enticed by a promise of $1,000 to steal one more. And he does. There can be no confidence that had there been no such extraordinary inducement he nevertheless would have com-

mitted the theft. Often cases say that extraordinary inducements create entrapment even if the defendant was predisposed to commit the crime. But really what extraordinary inducements do is show that the defendant's commission of the crime for which he's being prosecuted is not reliable evidence that he was predisposed to commit it. Thus, "inducement is significant chiefly as evidence bearing on predisposition: the greater the inducement, the weaker the inference that in yielding to it the defendant demonstrated that he was predisposed to commit the crime in question." *United States v. Hollingsworth*, *supra*, 27 F.3d at 1200. In contrast, an inducement is "ordinary" when it is "something close to what unfolds when a sting operation mirrors the customary execution of the crime charged." *United States v. Pillado*, *supra*, 656 F.3d at 765; see also *United States v. Sherman*, *supra*, 200 F.2d at 882.

A reasonable jury could have fit Mayfield's case to our hypothetical second or third cases had it been permitted to consider an entrapment defense. So far as appears, he had never robbed a stash house. It's true that after agreeing to participate in the stash-house robbery he bragged to the government's undercover agent that he had robbed stash houses. But he may just have been trying to reassure the agent, who was to lead the robbers into the stash house (the agent pretended to be a drug courier for the house), that he (Mayfield) was competent to participate in such a dangerous undertaking. He had never even been convicted of a drug offense, and there is no evidence, other than his boasting, that he was dealing drugs when approached by the undercover agent. The jury could also have found that Mayfield's

last major criminal act (an armed robbery not involving drugs) had occurred in the early 1990s; that when released from prison in 2005, four years before he agreed to rob the imaginary stash house, he had tried to go straight—moving away from the city in which he'd lived and had had criminal associates and getting a legal job. He had earned his GED, an associate's degree, and three vocational certificates in prison, and upon release had devoted personal time to volunteer activities. There is no evidence that he had committed any more robberies. He was 41 at the time of the sting, an age at which many criminals have aged out of violent crimes.

These were all facts for the jury to weigh (but the jury was not allowed to do so). The jury could have found that the defendant had not been predisposed to rob a stash house. It could have found this even if it thought him predisposed to commit armed robberies, for he was offered an extraordinary inducement to rob the imaginary stash house. Most robberies, even bank robberies, net little money for the robber. But a stash house is a potential goldmine. The informant told Mayfield that there were 25 to 35 kilograms of cocaine in the stash house. The cocaine was to be divided evenly among him, his three associates, and the instigator. This would net him 5 to 7 kilograms of cocaine, with a street value of $135,000 to $189,000. The potential gain, coupled with the informant's eagerness to betray his supposed employers by revealing the location of the stash house, created an inducement to commit a crime that, so far as appears, was unlike any that Mayfield had ever committed, or that he would ever have committed had it not been for the sting.

The inducement would not have been thought extra-ordinary by a stash house robber. If that is what Mayfield was, he would have been predisposed to accept the informant's offer. But a reasonable jury could have found that he was not a stash house robber, or even a drug dealer of any sort, was not predisposed to attempt a stash house robbery, and accepted the invitation because of financial desperation.

Not all fictitious stash house stings justify an entrapment instruction, even though such stings are a disreputable tactic. Law enforcement uses them to increase the amount of drugs that can be attributed to the persons stung, so as to jack up their sentences. Eda Katharine Tinto, "Undercover Policing, Overstated Culpability" 51-52 (NYU School of Law, Public Law Research Paper No. 12-04, August 2012; forthcoming in *Cardozo Law Review*, vol. 34, 2013), http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2016362 (visited Sept. 4, 2012). And such stings create an increased risk of entrapment because of "the potential for the extensive use of inducements and unrealistic temptations to encourage the suspects' criminal conduct." *Id*. at 52; see also *United States v. Briggs*, 623 F.3d 724, 729-30 (9th Cir. 2010). "[T]he government can 'minimize the obstacles a defendant must overcome to obtain the drugs.' For example, the police can convince a suspect that the stash house robbery would be a shock-ingly simple and easy crime to commit and can provide items, such as a car, needed to complete the crime." Tinto, *supra*, at 52-53. Nevertheless I accept the rejection of an entrapment defense in the superficially similar case of *United States v. Hall*, 608 F.3d 340, 343-44 (7th Cir.

2010). The court thought the defendant predisposed to rob a stash house, and the expected profit to him seemed modest, which was evidence of predisposition. The evidence of predisposition in this case is altogether thinner.

The government's major argument is that Mayfield's wholehearted commitment to the scheme once he decided to join proves predisposition—the government's brief barely mentions events before he agreed to participate in the robbery. But it is hardly surprising that having yielded to an extraordinary inducement he would do everything possible to earn the promised reward. If the defendant "was indeed entrapped, it is irrelevant that the entrapment was so effective as to make him not only a willing but an eager participant." *United States v. Evans*, 924 F.2d 714, 716 (7th Cir. 1991); cf. *Sherman v. United States*, 356 U.S. 369, 373-74 (1958) (the same defendant as in Judge Hand's case, which I cited earlier, but a subsequent appeal). Moreover, robbing a stash house is a dangerous business; the undercover agent told Mayfield that the robbers would encounter three armed men inside, who would kill to thwart a robbery. It was natural that Mayfield should seek to reduce the danger to himself by recruiting associates.

It's not as if he'd agreed to the scheme when the felon who was working for the police as an informant on a commission basis first proposed it to him. The informant, a coworker, knew Mayfield had a criminal past, and may have thought him likely to be persuadable to commit a crime because he expressed con-

cern about his low wage. According to Mayfield, the informant's first suggestion was that Mayfield join him in selling cocaine. He refused. Next the informant told him that his (the informant's) drug supplier (actually it was a government undercover agent for whom the informant worked) wanted to rob a stash house and that if Mayfield joined in the caper he would earn tens of thousands of dollars. Again Mayfield refused. The informant kept badgering him, without success. Then Mayfield's car was damaged in an accident, and he didn't have enough money to repair it. The informant lent him $180—and kept on badgering him to join in robbing the stash house. The informant pointed to the Gangster Disciples tattoo on Mayfield's arm and said that he (the informant) was still connected with the gang; a reasonable jury could have accepted Mayfield's claim that he thought the informant was warning him that he'd better repay the $180—or else. He couldn't repay it without the proceeds of the stash-house robbery. So finally he caved, and agreed to join the scheme. The majority opinion omits these critical facts.

Mayfield's prolonged initial reluctance, which appears to have lasted for weeks, suggests that he wasn't eagerly awaiting an opportunity to resume his abandoned life of crime. It was only when his need for money became acute and he feared that a failure to pay his debt to the informant would place his life in danger that the lure of participating in a robbery that would net him a large amount of money became irresistible. Or so at least the jury might have found had it been allowed to consider his entrapment defense.

Criminals do sometimes change and get their lives back on track and we don't want the government pushing them back into a life of crime. *Sherman v. United States*, *supra*, 356 U.S. at 375-76. This may be a case like *Sherman* in which "the Government plays on the weaknesses of an innocent party and beguiles him into committing crimes which he otherwise would not have attempted." *Id.* at 376 (footnote omitted). Sherman like Mayfield had a criminal record but was trying to go straight.

I do not say that Mayfield *was* entrapped. But there is considerable evidence that he may have been, and, considering the stakes (he was sentenced to 322 months in prison, close to a life sentence given his age), he was entitled to present an entrapment defense to the jury. The government would have had a heavy burden of disproving the defense.

In closing I want to say something about the sentence and about the criticized practice of fictitious stash house stings; these are related. I cannot imagine the sense of imprisoning Mayfield for 27 years (minus modest good-time credit if he behaves himself). I should think a sentence of 5 years more than adequate. Can there be any serious concern that upon emerging he would embark on a career of robbing stash houses? That if approached by anyone inviting him to launch such a career he would listen to the person? Is there anything in the record to make such a possibility real? Before succumbing to the blandishments of the informant, Mayfield was working at an honest job. He was supporting

himself. He was not a public charge. Now, as a result of the sting, we the taxpayers will be supporting him at considerable expense for the next quarter century. Does that make *any* sense?

And now consider the role of such stings in the "war on drugs." Are they likely to reduce the sale and use of illegal drugs? No; they are likely to have the opposite effect. Stash house robbers do not increase the amount of drugs in circulation, since they steal their drugs instead of making or importing them. The effect of a fictitious stash house sting, when the person stung is, unlike Mayfield, a real stash house robber, is therefore to make stash houses more secure by reducing the likelihood of their being robbed. A sting both eliminates one potential stash house robber (unless the defendant was entrapped) and deters other criminals from joining stash house robberies, since they may turn out to be stings. The greater security that fictitious stash house stings confer on real stash houses—security obtained at no cost to the operators of stash houses—reduces their cost of self-protection, which is a principal cost of the illegal-drug business. The lower a business's costs, the lower the prices charged consumers, and so the greater the demand for illegal drugs and the more sales and consumption of them. The operators of stash houses would *pay* law enforcement to sting potential stash house robbers.