**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, | No. 11-10623 |
| v. | D.C. No. 4:09-cr-02073-CKJ-GEE-2 |
| ALEX JOSEPH PEDRIN, JR., AKA Alex Pedrin, Jr., *Defendant-Appellant*. | OPINION |

Appeal from the United States District Court
for the District of Arizona
Cindy K. Jorgenson, District Judge, Presiding

Argued and Submitted
March 13, 2015—San Francisco, California

Filed August 17, 2015

Before: John T. Noonan, William A. Fletcher,
and Morgan Christen, Circuit Judges.

Opinion by Judge W. Fletcher;
Dissent by Judge Noonan

## SUMMARY[*]

### Criminal Law

Affirming a conviction and sentence for conspiracy to possess with intent to distribute cocaine, the panel held that the defendant's prosecution did not result from "outrageous government conduct."

The defendant was the target of a drug "stash house" sting, in which an undercover agent of the Bureau of Alcohol, Tobacco, and Firearms suggested that he, the defendant, and a co-conspirator join forces, rob a fictitious stash house, and split the proceeds. Following *United States v. Black*, 733 F.3d 294 (9th Cir. 2014), the panel held that this reverse sting operation was not outrageous government conduct warranting the dismissal of the indictment where the co-conspirator reached out to the government, and not vice versa; the defendant readily agreed to participate in the supposed stash-house robbery; and the defendant supplied plans and materials. These circumstances provided a sufficient basis for the government to infer that the defendant had a predisposition to take part in the planned robbery.

Dissenting, Judge Noonan wrote that the defendant was not known to the government to be predisposed to raid a stash house at the time when an agent of the ATF proposed this action to him. Accordingly, even though the defendant did not argue entrapment, the court should hold that he was entrapped because the ATF originated the criminal design,

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

implanted it in the defendant's mind, and induced him to commit the crime that the government then prosecuted.

## COUNSEL

David Lipartito (argued), Tucson, Arizona, for Defendant-Appellant.

Robert Lally Miskell (argued), Assistant United States Attorney, and John S. Leonardo, United States Attorney, Tucson, Arizona, for Plaintiff-Appellee.

## OPINION

W. FLETCHER, Circuit Judge:

In this appeal, we again address what constitutes "outrageous government conduct" in the context of a reverse sting operation.

## I. Background

For several decades, the Bureau of Alcohol, Tobacco, and Firearms ("ATF") has conducted reverse sting operations in order to identify and apprehend people who can be enticed into robbing fictitious drug "stash houses" (houses in which drugs are "stashed"). In these "stash house stings," an undercover agent poses as a disgruntled drug courier with knowledge about a stash house protected by armed guards and containing a large amount of cocaine. The agent suggests to targets of the reverse sting that they join forces, rob the house, and split the proceeds. Once the targets have taken

steps to rob the fictional house, they are arrested and charged with conspiracy to violate federal narcotics laws.

The defendant in this case, Alex Pedrin, Jr., was the target of a stash-house sting in Arizona in August 2009. The sting was planned by ATF agent Richard Zayas, at the time a 20-year veteran of the bureau. According to Zayas, he has planned "hundreds" of stash-house stings, beginning in Miami, Florida in the 1990s. *See, e.g.*, *United States v. Cortes*, 757 F.3d 850, 855 (9th Cir. 2014) (as amended) (noting Zayas's involvement); *United States v. Black*, 733 F.3d 294, 298 (9th Cir. 2013) (same); *United States v. Docampo*, 573 F.3d 1091, 1093 (11th Cir. 2009) (same); *United States v. Paisley*, 178 F. App'x 955, 957 (11th Cir. 2006) (same). "[T]he ATF has a standard playbook for such operations, and the facts between cases are frequently nearly identical." *United States v. Kindle*, 698 F.3d 401, 404 (7th Cir. 2012), *rev'd en banc sub nom. United States v. Mayfield*, 771 F.3d 417 (7th Cir. 2014) (en banc).

Zayas met Pedrin through a confidential informant, Jesus Contreras. Contreras was working with Zayas in the ATF's Tucson office. Contreras told Zayas that his nephew, Omar Perez, had called him to "ask[] for work," which Contreras understood to mean work stealing drugs. Contreras set up a meeting between Zayas, Perez, and Pedrin on August 17, 2009. The meeting took place in Zayas's car. During a videorecorded conversation in the car, Zayas described himself to Perez and Pedrin as a disgruntled cocaine courier. He told the two men that he knew about a local stash house, guarded by two armed men, that contained between 40 and 50 kilograms of cocaine. Zayas said he was looking for "someone to go in there and take everything." He asked the

men, "What do you think? . . . Can that be done?" Each man assented.

Zayas met with Perez and Pedrin again on August 19. The men agreed that the robbery would take place two days later, on August 21. Zayas pressed Perez and Pedrin for details about their plan. Pedrin responded, "We'll just . . . go right when you go in so we're all together, you know what I mean? . . . Put everybody down. Make them tell us where everything is at and then we leave and then we go split it up." In response to Zayas's questions, Pedrin said he and Perez had recruited three other men. Two of them would go into the house with Pedrin and the other would stay outside with Perez. Pedrin told Zayas that he had obtained "walkie talkies and scanners" to facilitate the operation. The details were planned by the defendants themselves. At no point did Zayas instruct Pedrin and Perez how to carry out the robbery.

On August 21, the day of the planned robbery, Zayas met with all five men. Zayas stated again that the stash house contained between 40 and 50 kilograms of cocaine and that it was guarded by at least two armed men. Zayas then instructed Pedrin and the others to follow him to a storage locker at which they were to drop Zayas's share of cocaine after the robbery. On the way to the locker, however, the men became suspicious and pulled into a nearby trailer park. One of the men took a different car to the storage locker location, where he saw ATF agents. He called the others and warned them that it was a sting. The men fled but were picked up by federal and state officers shortly afterward.

Pedrin was charged with conspiracy to possess with intent to distribute 40 to 50 kilograms of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(ii), and 846. He was

tried before a jury in February 2011. One of Pedrin's co-defendants, Terry Bombard, testified at Pedrin's trial in exchange for a lighter sentence. Bombard said that he had met Pedrin over four years earlier in connection with another robbery of a drug stash house. Pedrin, he said, had organized a "gang" of nine men to steal between 200 to 250 pounds of marijuana. Bombard testified that he had participated in thirteen or fourteen stash-house robberies, most or all of them with Pedrin. Pedrin was convicted and sentenced to 210 months in prison.

Pedrin challenges his conviction and sentence on eleven grounds. We resolve Pedrin's contention that his prosecution resulted from "outrageous government conduct" in this opinion, and the remaining ten contentions in a concurrently filed memorandum disposition. We have jurisdiction under 28 U.S.C. § 1291. We review the district court's decision not to dismiss the indictment for outrageous government misconduct de novo, viewing the evidence in the light most favorable to the government. *Black*, 733 F.3d at 301. We affirm.

## II. Discussion

A prosecution results from outrageous government conduct when the actions of law enforcement officers or informants are "so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *United States v. Russell*, 411 U.S. 423, 431–32 (1973). A federal court must dismiss a prosecution based on such actions. The standard for dismissal on this ground is "extremely high." *United States v. Smith*, 924 F.2d 889, 897 (9th Cir. 1991). Dismissals are "limited to extreme cases in which the government's conduct

violates fundamental fairness." *United States v. Gurolla*, 333 F.3d 944, 950 (9th Cir. 2003). An indictment can be dismissed only where the government's conduct is "so grossly shocking and so outrageous as to violate the universal sense of justice." *United States v. Stinson*, 647 F.3d 1196, 1209 (9th Cir. 2011) (quoting *United States v. Restrepo*, 930 F.2d 705, 712 (9th Cir. 1991)).

Pedrin argues that the reverse sting operation that led to his conviction was "outrageous government conduct" under this standard and that his indictment accordingly should be dismissed. We considered and rejected a similar argument in *Black*, 733 F.3d 294. Like Pedrin, the defendants in *Black* were the targets of a stash-house sting operation planned by Agent Zayas. *Id.* at 298–301. They argued that Zayas, by initiating contact with the defendants, describing the fictitious stash house, and suggesting that they rob it — all without any individualized suspicion about the defendants' criminal history — had engaged in "outrageous" conduct, and that their indictments should be dismissed. *See id.* at 306. We expressed "concerns" with the ATF's tactics, but we ultimately concluded that they "did not cross the line." *Id.* at 307, 310. *Black* compels the same conclusion here.

In *Black*, we identified six factors "as relevant to whether the government's conduct was outrageous":

> (1) known criminal characteristics of the defendants; (2) individualized suspicion of the defendants; (3) the government's role in creating the crime of conviction; (4) the government's encouragement of the defendants to commit the offense conduct; (5) the nature of the government's

> participation in the offense conduct; and
> (6) the nature of the crime being pursued and
> necessity for the actions taken in light of the
> nature of the criminal enterprise at issue.

*Id.* at 303. We noted that "the first three are most relevant to the way in which the government set up the sting," while "the fourth and fifth look to the propriety of the government's ongoing role in the sting," and the last focuses on the justification for the operation. *Id.* at 303–04. Attempting to distinguish this case from the facts of *Black*, Pedrin focuses on the first three factors. He contends that Zayas knew less about the defendants' propensity to commit crimes in this case than he knew about the defendants' similar propensities in *Black*. We disagree.

First, the "major" concern present in *Black* — that the government found the defendants in that case by "trolling for targets," *id.* at 303 — is not present here. In *Black*, the confidential informant visited "a bad part of town, a bad bar, you know . . . bars where you've got . . . a lot of criminal activity" in order to identify and recruit targets. *Id.* (alterations in original). We wrote in *Black*, "The risk inherent in targeting such a generalized population is that the government could create a criminal enterprise that would not have come into being but for the temptation of a big payday . . . ." *Id.* Here, by contrast, one of the defendants — Omar Perez, Pedrin's co-conspirator — approached the informant to look for work stealing drugs. The government thus had little reason to suspect that Pedrin and Perez were "vulnerable" persons "who would not otherwise have thought of doing such a robbery." *Id.*

Second, as in *Black*, the government's subsequent inquiries "mitigated" any concerns it might have had that the defendants were reluctant participants in the operation. *See id.* at 307. On August 17, when they first met with Zayas, Pedrin and Perez readily agreed to carry out the robbery. Two days later, they had recruited three other men; had obtained "walkie talkies and scanners" to facilitate the robbery; and had assigned roles and responsibilities during the robbery. Although Pedrin and Perez were less voluble than the defendants in *Black*, who boasted loudly of their criminal records, their conduct — like the conduct of the *Black* defendants — gave rise to an inference that they had previously committed similar crimes. *See id.* at 300, 307.

We note that in assessing whether the government's conduct was "outrageous," the relevant question is what the government knew when it was setting up the sting, not what it learned later. On appeal, the government argues that Pedrin's criminal record shows that Zayas "infiltrated [a] home invasion gang that was already engaged in criminal activity." But the government admits that Zayas was not aware, as he was setting up the sting, that Pedrin had previously robbed other stash houses. Instead, the government learned of Pedrin's alleged prior involvement in stash house robberies only after it had apprehended and interviewed Bombard, one of the co-conspirators. As we suggested in *Black*, the question is not whether a defendant *in fact* "may have been predisposed to commit a stash house robbery." *Id.* at 306 n.9. Rather, it is whether the government had reason to believe, in light of what it knew as it was setting up the sting, that a defendant was so predisposed. If *Black* was less than clear on this point, we make it clear today: What the government learns only after the fact cannot supply the individualized suspicion that is

necessary to justify the sting if the government had little or no basis for such individualized suspicion when it was setting up the sting.

In this case, however, the government knew enough about Pedrin as it was setting up the sting to eliminate the possibility that "it sought to manufacture a crime that would not have otherwise occurred." *Id.* at 307. One of Pedrin's co-conspirators, Perez, reached out to the government, and not vice versa; Pedrin readily agreed to participate in the supposed stash-house robbery; and Pedrin supplied plans and materials. This provided a sufficient basis for the government to infer that Pedrin had a predisposition to take part in the planned robbery. Like the majority in *Black*, we do not lightly dismiss the "concerns about the risks of government overreaching inherent in fictitious stash house sting operations." *Id.* at 310 n.13. But we are compelled by *Black* to conclude that the government's conduct here was not "so grossly shocking and so outrageous as to violate the universal sense of justice." *Stinson*, 647 F.3d at 1209 (quoting *Restrepo*, 930 F.2d at 712). The district court therefore correctly denied Pedrin's motion to dismiss the indictment.

## Conclusion

Pedrin's prosecution did not result from "outrageous government conduct." For that reason, and for the reasons stated in our concurrently filed memorandum disposition, we **AFFIRM** his conviction and sentence.

NOONAN, Circuit Judge, dissenting:

The undisputed and dispositive fact is that Pedrin was not known to the government to be predisposed to raid a stash house at the time when an agent of the ATF proposed this action to him. The law is settled: "Government agents may not originate a criminal design, implant in an innocent person's mind the disposition to commit a criminal act, and induce commission of a crime so that the government may prosecute." *Jacobson v. United States*, 503 U.S. 540, 548 (1992). In this case, the ATF originated the criminal design, implanted it in Pedrin's mind and induced him to commit the crime that the government then prosecuted.

Who has the burden of proof as to the defendant's disposition? In *Jacobson*, the Supreme Court provided the answer: "[T]he prosecution must prove beyond reasonable doubt that the defendant was disposed to commit the criminal act prior to first being approached by government agents." *Id.* at 549. The timing of the defendant's disposition is critical: "The sole issue is whether the Government met its burden of proving that petitioner was *pre*disposed to violate the law *before* the Government intervened." *Id.* at 549 n.2. (italics in original).

No showing has been made that Pedrin was known to be predisposed to commit this crime prior to being approached by the agents of ATF. The ATF laid out the entire stash house scheme to him before he had said a single word. The prosecution of his case should be dismissed.

The majority addresses Pedrin's claim of outrageous government conduct – a defense that the Supreme Court has never found to be applicable. *See United States v. Russell*,

411 U.S. 423, 431 (1973). The majority does not address entrapment for what would appear to be a good reason: entrapment was not argued by Pedrin. It is within our power to hold that the argument was waived. It is also within our power to notice a meritorious argument unmentioned by counsel. *See Hormel v. Helvering*, 312 U.S. 552, 557 (1941) ("There may always be exceptional cases or particular circumstances which will prompt a reviewing or appellate court, where injustice might otherwise result, to consider questions of law which were neither pressed nor passed upon by the court or administrative agency below."); *see also Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 540 (1999). As a court, we are more than referees tallying scores. We have a live concern that human beings caught in the legal process be treated fairly.

Entrapment is not a defense created by the Constitution or by statute. It is judge-created. It was first recognized by a federal court in a decision of the Ninth Circuit. *Woo Wai v. United States*, 223 F. 412 (9th Cir. 1915). It was first recognized by the Supreme Court in *Sorrells v. United States*, 287 U.S. 435 (1932).

Entrapment as a defense is the creation of a collaboration between a court and Congress. What Chief Justice Hughes said in *Sorrells* was that Congress could not have intended to punish a man trapped into buying bootleg liquor. Chief Justice Hughes did not cite the legislative history of the National Prohibition Act. What he did was to attribute sensible motivation to the authors of the prohibition law. In his reading they did not intend to criminalize the purchase of the liquor when the purchase was induced by a prohibition agent.

This kind of collaboration – the judicial reading of legislative purpose without reference to specific legislative evidence – has a history commanding respect, as Chief Justice Hughes demonstrated beginning with the statement that the literal interpretation of statutes "has frequently been condemned." *Id.* at 446. He continued with the invocation of a decision by Chief Justice John Marshall. *Sorrells*, 287 U.S. at 446.

In Marshall's decision, *United States v. Palmer*, 16 U.S. 1610 (1818), John Palmer and Thomas Wilson of Boston and Barney Colloghan of Newburyport were charged by a federal grand jury with attacking and looting a Spanish ship during the rebellion against Spain in South America. The New England privateers had taken gold and silver worth $60,000 plus a rich cargo of commodities including honey, rum, and sugar. The circuit court divided one–one on the application of the federal piracy statute, and the case was certified to the Supreme Court. No counsel appeared for the prisoners. The government earnestly argued for their conviction. Chief Justice Marshall delivered the opinion of the Court.

In so many words, the statute applied to "any person or persons" who committed piracy. No exceptions were specified. Anyone in the world who committed piracy fell within the law. But had Congress meant to include every person? No, Marshall answered, Congress must have intended only crimes that were against the United States. *Palmer*, 16 U.S. at 624–35. The prisoners were free.

Analogously, in *United States v. Kirby*, the defendant was indicted for obstructing the mail. 74 U.S. 482 (1868). He had acted on a state warrant and arrested a mail carrier on a charge of murder. Speaking for a unanimous court, Justice

Stephen Field reversed. His brief opinion appealed to "the common sense of man." *Id.* at 487. As Puffendorf had noted, a Bolognese statute that forbad the drawing of blood in the street did not apply to a surgeon who treated a person who fell in the street. Again, as Plowden said, a statute against a jail break would not apply to a prisoner whose life was endangered by fire in the prison. It was "always . . . to be presumed" that the legislature intended exceptions that would avoid "injustice, oppression, or absurd consequences." *Id.* at 486–87.

In *Holy Trinity Church v. United States*, a federal statute made it unlawful to prepay the transportation of any aliens who were under contract to perform "service of any kind" in the United States. 143 U.S. 457 (1892). An Episcopal church had paid the way from England of a minister who would be its pastor. The United States sued to collect a penalty. The circuit upheld the fine. The Supreme Court unanimously reversed. The reason for the law, Justice Brewer wrote, was to be found in its legislative history that showed that its purpose was to prevent employers importing "an ignorant and servile class of foreign laborers." *Id.* at 463. The statute expressly exempted the importation of actors, artists, lecturers, singers, and domestic servants. The existence of these exemptions made by the legislature did not deter the court from adding its own. No purpose against religion could be found in the statute because "this is a religious people." *Id.* at 465. The legislature could not have meant to penalize the importation of priests, ministers, or rabbis. Ecumenical within the orbit of religious belief then active in America, the court's opinion met with acceptance.

Invoking these and other precedents showing the latitude the court enjoyed in creating exceptions to federal law, Chief

Justice Hughes in *Sorrells* turned to the case at hand. Congress could not have meant the prohibition law should be enforced "by the instigation by government officials of an act on the part of persons otherwise innocent in order to lure them by its commission and to punish them." *Sorrells*, 287 U.S. at 448. Prosecution in such a case was "outside the purview" of the statute and was "abhorrent to the sense of justice." *Id.* at 449. The judgment of conviction was reversed.

In 1958, the Supreme Court explicitly reaffirmed *Sorrells*' teaching on entrapment. *Sherman v. United States*, 356 U.S. 369 (1958). Sherman, seeking to overcome an addiction to narcotics, encountered Kalchinian, already active as an informer, who asked Sherman if he knew a good source of narcotics. After several repetitions of the question, Sherman obtained narcotics which he shared with Kalchinian, charging him $15 per delivery. Kalchinian then tipped off a narcotics agent, who observed further sales by Sherman to Kalchinian. At trial, the question was whether Sherman was "already predisposed" to sell the narcotics or whether the informer "had caused an otherwise unwilling person" to sell the drugs. *Id.* at 371. The district court and the Second Circuit confirmed Sherman's conviction. Chief Justice Warren, writing for the Supreme Court, reversed, holding it to be "patently clear" that Sherman had been induced by Kalchinian. *Id.* at 373. The sales to the narcotics agent were not independent acts, but part of a course of conduct by Sherman which was the product of the informer's inducement. Sherman's four-year old conviction for selling drugs and his five-year old conviction for buying drugs were not evidence of Sherman's predisposition when Kalchinian approached him.

*Sorrells* is a live and controlling precedent. The case has been cited 28 times by the Supreme Court, 102 times by this circuit, and 23 times by district courts within the circuit. *Sorrells* has never been overruled or treated as irrelevant. Its central holding has not been challenged. *Sorrells* is an apt precedent for holding the ATF's stash house trick to be entrapment. In fact, the ATF has exceeded the prohibition agent in *Sorrells*. He sold actual liquor. The ATF sponsored the theft of imaginary drugs.

The majority correctly concedes that "[w]hat the government learns only after the fact cannot supply the individualized suspicion that is necessary to justify the sting." Maj. Op. at 9–10. What did the ATF know about Pedrin before it approached him? The majority does not say. The record says that the ATF knew nothing. It was a shot in the dark when the ATF enlisted Pedrin as a co-conspirator. The majority speaks of a different defendant, Omar Perez, when at page 8 it addresses the question. What the ATF knew of Perez establishes nothing as to what the ATF knew about Pedrin.

Once enlisted, Pedrin recruited others, sketched a scenario for the robbery, and obtained walkie-talkies and scanners. As the ATF had already selected Pedrin as a player in its imagined robbery, none of this activity had any significance. The ATF was already at work with Pedrin cast by the agency as a co-conspirator.

As the case now stands, the ATF enhances its reputation by its successful ruse. The government of the United States is diminished by its dependence on the duplicity of the agency. Because of a choice made by Pedrin or his counsel, entrapment was not argued and *Jacobson* was uncited. By

the rules governing litigation we can affirm Pedrin's conviction.  By our commitment to a humane justice, we are called to dismiss the case made by the entrappers.