**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
   *Plaintiff-Appellee,*

v.

GLEN RAY BRIGGS,
   *Defendant-Appellant.*

No. 09-30108

DC No. CR 07-2063 LRS

UNITED STATES OF AMERICA,
   *Plaintiff-Appellee,*

v.

GLEN RAY BRIGGS,
   *Defendant-Appellant.*

No. 09-30111

DC No. CR 07-2114 LRS

UNITED STATES OF AMERICA,
   *Plaintiff-Appellee,*

v.

GLEN RAY BRIGGS,
   *Defendant-Appellant.*

No. 09-30115

DC No.
CR 07-2066 LRS

UNITED STATES OF AMERICA,
   *Plaintiff-Appellee,*

v.

GLEN RAY BRIGGS,
   *Defendant-Appellant.*

No. 09-30116

DC No. CR 07-2065 LRS

OPINION

16473

Appeals from the United States District Court
for the Eastern District of Washington
Lonny R. Suko, District Judge, Presiding

Argued and Submitted
March 4, 2010—Seattle, Washington

Filed September 27, 2010

Before: A. Wallace Tashima, Raymond C. Fisher, and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge Tashima

## COUNSEL

James A. Goeke, Assistant United States Attorney, Yakima, Washington, for the plaintiff-appellee.

Edwin F. Alden, Kennewick, Washington, for the defendant-appellant.

**OPINION**

TASHIMA, Circuit Judge:

In April 2008, Glen Briggs pled guilty to a host of drug-related charges. Six months, a new lawyer, and a change of heart later, Briggs filed a motion to withdraw his plea of guilty. The district court denied the motion and eventually sentenced Briggs to 324 months' imprisonment. Briggs timely appealed. We have jurisdiction pursuant to 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291. We affirm Briggs' conviction, but vacate his sentence and remand for resentencing.

**I.**

**A.**

In early 2007, based on a referral from local police in Yakima, Washington, the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") began investigating Briggs for trafficking in drugs and weapons. Acting undercover, ATF Special Agent Eric Floyd succeeded in making a number of methamphetamine purchases from Briggs. Floyd also indicated that he wanted to purchase guns from Briggs. Although Briggs indicated his willingness to sell guns, no sales ever materialized.

During the course of its investigation, ATF began to suspect that Briggs was involved in a string of home invasion robberies in the Yakima area. It therefore decided to stage a "reverse sting" operation. At a meeting with Briggs on February 28, 2007, Floyd floated the idea of robbing a "stash house" in Tacoma. According to Floyd, if they timed it right, the house would contain at least twenty kilograms of cocaine and ten pounds of methamphetamine. The stash house and drugs were, of course, entirely fictional. Nonetheless, Briggs immediately expressed his desire to be included in the job. He told Floyd that he had "the hardest working crew in town"

and that they "do this all the time." The two agreed to discuss plans for the operation at a later date.

A month later, on March 28, 2007, Briggs and Agent Floyd met in Michael's Allstar Tavern, a bar in Yakima, where they were joined by Briggs' brother Michael and Matt Steadman, an undercover member of the Yakima Sheriff's Office.[1] The group discussed the robbery in general terms, with each person at the meeting stating that he wanted to participate. The robbery was eventually set for April 19, 2007. On the morning of that day, Floyd met Briggs and his brother at a Motel 6 and told them he had a van ready to go to Tacoma. Briggs, moving slowly from an apparent late night of drinking, told Floyd he had to "pick up his guys." Over the next few hours, Floyd called Briggs repeatedly, telling him to hurry up and encouraging him to leave people behind so they could get on the road. Briggs refused, telling Floyd that he was waiting for someone to get out of the shower. Briggs claimed that this person "had access to the guns" that they needed for the robbery.

Briggs and his brother eventually returned to the Motel 6 with their co-defendant, Julian Mora, in the car. They met with Floyd at the van, and indicated that they were ready to go. Michael Briggs, at his brother's request, returned to his car and retrieved a bulletproof vest. Floyd then told the defendants that if they "wanted to go ahead, to get in the van." After the three entered the van, they were arrested by an ATF SWAT team. When they were arrested, none of the defendants had any guns on them, and no guns were ever recovered in connection with the conspiracy.

---

[1]Gabriel Vargas also attended that meeting, but he does not appear to have participated further in the conspiracy and was never indicted.

## B.

Briggs was ultimately charged in four separate indictments containing a total of eight counts. The two most serious counts related to the conspiracy to rob the fictional stash house: Briggs was charged with conspiracy to possess with intent to distribute cocaine and methamphetamine and conspiracy to possess a firearm in connection with a drug trafficking crime. Of the remaining six counts, four charged Briggs with completed sales of methamphetamine, and two charged him with conspiracy to escape and attempted escape from federal prison.

On April 6, 2008, Briggs entered into a consolidated plea agreement through which he pled guilty to all eight of the above counts. Briggs' plea agreement specified that he would receive a minimum sentence of ten years in prison pursuant to 21 U.S.C. § 841(b)(1)(A), but made no further representations regarding his sentence. The next day, the district court held a change of plea hearing. After conducting its colloquy, the court found that Briggs' plea was knowing, intelligent, and voluntary, and accepted his guilty plea to all charges.

Six months later, Briggs, represented by new counsel, filed a motion to withdraw his guilty plea. The primary basis for the motion was that Briggs "suffers from undetermined psychological problems and . . . did not understand and was not capable of understanding the plea agreement in this matter." The motion also claimed that the plea agreement "seriously overstate[d]" Briggs' criminal conduct. The court, finding that Briggs had understood his plea at the time it was made and could point to no intervening reason for his change of heart, denied his request.

Briggs was thereafter sentenced to serve a total of 324 months' imprisonment, a term at the bottom of his Guidelines range. Briggs timely appealed.

## II.

We review the district court's denial of Briggs' motion to withdraw his guilty plea for abuse of discretion. *United States v. Ensminger*, 567 F.3d 587, 590 (9th Cir. 2009). We also review the district court's sentencing decisions for abuse of discretion. *Gall v. United States*, 552 U.S. 38, 46 (2007); *United States v. Carty*, 520 F.3d 984, 993 (9th Cir. 2008) (en banc). We review Briggs' overall sentence for reasonableness, and will set aside his sentence only if it is procedurally erroneous or substantively unreasonable. *See Gall*, 552 U.S. at 46; *Carty*, 520 F.3d at 993.

## III.

Briggs challenges both the denial of his motion to withdraw his guilty plea and his sentence. We conclude that the district court did not abuse its discretion when it denied Briggs' motion to withdraw his guilty plea. We therefore affirm his conviction. We also conclude, however, that Briggs' sentence was procedurally flawed. Accordingly, we vacate his sentence and remand for resentencing.

## A.

**[1]** In order to withdraw his guilty plea, Briggs bore the burden of establishing that a "fair and just reason" existed for the withdrawal. Fed. R. Crim. P. 11(d)(2)(B). This standard "is generous and must be applied liberally." *Ensminger*, 567 F.3d at 590. We have previously held that fair and just reasons include "inadequate Rule 11 plea colloquies, newly discovered evidence, intervening circumstances, or any other reason for withdrawing the plea that did not exist when the defendant entered his plea." *Id.* (quoting *United States v. Jones*, 472 F.3d 1136, 1141 (9th Cir. 2007)) (internal quotation marks omitted).

**[2]** We do not find any of the reasons Briggs has provided compelling enough to make the denial of his motion an abuse

of discretion. Briggs' primary reason for seeking to withdraw his guilty plea was that he did not understand the consequences of his plea agreement at the time of his change of plea hearing. He claimed that his lack of access to his attorney, who lived approximately 250 miles away from where he was incarcerated, and "undetermined psychological problems" rendered him incapable of understanding the agreement.

**[3]** Our review of the record, however, has uncovered no evidence that Briggs was incapable of understanding his guilty plea. Although he has an IQ of 70, a psychological evaluation found that he had "the capacity to make a knowing decision" about his plea. In fact, Briggs discussed in detail with the psychologist his own calculation of the sentence he faced, the good-behavior time he expected to accrue, and the ultimate period of incarceration that would result. Contrary to Briggs' assertions, his understanding of the consequences of his guilty plea appears to have been quite sophisticated.

**[4]** The transcript of the plea colloquy confirms that Briggs understood the plea agreement. He responded to the district court's questions and asked questions of his own when he did not understand the point the district court made. He also admitted to the factual allegations in the plea agreement, and indicated that he was satisfied with his lawyer's representation. We take the district court's detailed colloquy with Briggs as strong evidence that Briggs understood the meaning of his actions. *See United States v. Ross*, 511 F.3d 1233, 1236 (9th Cir. 2008) ("Statements made by a defendant during a guilty plea hearing carry a strong presumption of veracity in subsequent proceedings attacking the plea.").

**[5]** Briggs' true complaint is not that he lacked the capacity to understand his guilty plea, but that he misunderstood the severity of the sentence that he faced. Briggs contends that he expected to receive a sentence of approximately 200 months' imprisonment when he entered his guilty plea. It was not until

the Pre-Sentence Report calculated a Guidelines range of 360 months to life that he realized he faced a sentence nearly twice as long as the one he expected.

**[6]** We have previously expressed skepticism at the proposition that a defendant may change his plea solely because he underestimated the severity of the sentence he faced. *See Shah v. United States*, 878 F.2d 1156, 1162 (9th Cir. 1989) ("Nor do we believe that fear of receiving a harsh sentence, standing alone, constitutes a 'fair and just' reason to withdraw a plea, even if counsel's initial advice as to length of plea turned out to be inaccurate."). While we have on occasion allowed a defendant to change his plea for such a reason, we have done so only in exceptional circumstances. *See United States v. Davis*, 428 F.3d 802, 805-08 (9th Cir. 2005) (allowing withdrawal of guilty plea where defendant's counsel "grossly mischaracterized" the defendant's possible sentence by telling him he was likely to get probation, rather than the eight-years' imprisonment the government was seeking).

**[7]** Briggs' case is of a different nature than *Davis.* He acknowledges that he expected a sentence in the range of 200 months at the time he pled guilty. He was therefore aware that he faced a substantial term of incarceration. Further, while he made conclusory allegations of inadequate legal advice before the district court, he failed to substantiate those allegations in any way. Accordingly, we conclude that the district court did not abuse its discretion in denying Briggs' motion. No intervening event occurred that would constitute a "fair and just" reason for Briggs' change of heart. To the contrary, it appears that Briggs only wanted to change his plea once he was face-to-face with the full consequences of his conduct.**²**

---

**²**We also reject Briggs' contention that the plea agreement "seriously overstates" his criminal conduct. His brother was convicted by a jury of identical charges, and it is undisputed that Briggs, as the ringleader of the conspiracy, was far more culpable for the crimes they committed.

## B.

**[8]** Briggs also challenges the 324-month sentence he received following his guilty plea. He first contends that the government engaged in "sentencing entrapment." Sentencing entrapment occurs where "a defendant, although predisposed to commit a minor or lesser offense, is entrapped in committing a greater offense subject to greater punishment." *United States v. Staufer*, 38 F.3d 1103, 1106 (9th Cir. 1994). In those cases where sentencing entrapment occurs, the amount of drugs used in calculating the defendant's sentence should be reduced by the amount that "flow[s] from [the] entrapment." *United States v. Naranjo*, 52 F.3d 245, 250 (9th Cir. 1995); *see also* U.S.S.G. § 2D1.1, app. n.12 (2007).

**[9]** Briggs' claim of sentencing entrapment is unusual. Typically, sentencing entrapment occurs when a government agent convinces a drug dealer to purchase or sell more drugs than he is otherwise inclined to deal in. *See*, *e.g.*, *United States v. Mejia*, 559 F.3d 1113, 1118 (9th Cir. 2009); *United States v. Riewe*, 165 F.3d 727, 728-29 (9th Cir. 1999) (per curiam); *Naranjo*, 52 F.3d at 249-50; *Staufer*, 38 F.3d at 1104-08; *see also United States v. Parrilla*, 114 F.3d 124, 126-29 (9th Cir. 1997) (finding that the defendant may have been entrapped into possessing a gun during a drug trafficking crime where government agent proposed trading the gun for drugs). Briggs does not argue that the stash house contained more drugs than he wanted; in fact, the evidence against him suggests he was enthusiastic about the large quantity of drugs the stash house purportedly contained. Instead, Briggs argues that the only reason the government set the amount of drugs at such a high level was to impact his sentence.

**[10]** We do not disagree with the theory behind Briggs' argument. In fictional stash house operations like the one at issue here, the government has virtually unfettered ability to inflate the amount of drugs supposedly in the house and thereby obtain a greater sentence for the defendant. In fact,

not only is the government free to set the amount of drugs in a fictional stash house at an arbitrarily high level, it can also minimize the obstacles that a defendant must overcome to obtain the drugs. *See*, *e.g.*, *United States v. Williams*, 547 F.3d 1187, 1193 (9th Cir. 2008) ("[The ATF Agent] said that in a few days, the stash house would contain one hundred kilograms of cocaine and between fifty and sixty thousand dollars in currency, guarded only by the two women who count the money and a single guard with a sawed off shotgun."). The ease with which the government can manipulate these factors makes us wary of such operations in general, and inclined to take a hard look to ensure that the proposed stash-house robbery was within the scope of Briggs' ambition and means.

[11] In this case, however, we conclude that Briggs' guilty plea forecloses him from raising this claim. *Cf. United States v. Dickey*, 924 F.2d 836, 839 (9th Cir. 1991) ("[A]t least where a defendant pleads guilty to an offense, we see no warrant for the argument that governmental . . . misconduct should mitigate the sentence of an admittedly guilty defendant." (internal quotation marks and alteration omitted)). In his plea agreement Briggs admitted that the conspiracy he was charged with involved "at least 5 kilograms but less than 15 kilograms of methamphetamine and at least 15 kilograms but less than 50 kilograms of cocaine." Thus, he fully admitted to the drug quantities on which his sentence was based. Further, Briggs made no effort before the district court to show that he was incapable of consummating the proposed robbery. Because we have not been presented with any such evidence and because Briggs admitted to the charged drug quantities, we reject Briggs' bare assertion that he was the victim of sentencing entrapment.[3]

---

[3]Although we need not reach the issue, the burden of establishing that the drug quantities involved were not within the scope of Briggs' ambition or means appears to have been on Briggs. *See United States v. Barnes*, 993 F.2d 680, 682-84 (9th Cir. 1993) (placing on defendant the burden to show that the defendant could not reasonably have produced the $500,000 necessary to complete the drug transaction on which his conviction was based).

**[12]** Briggs' final contention is more convincing. He argues that the district court erroneously calculated his sentence under the Sentencing Guidelines when it applied a firearm-related enhancement to his offense level.[4] We agree.

**[13]** The offense level that ultimately produced Briggs' Guidelines sentencing range derived from his conviction of conspiracy to possess a firearm in connection with a drug-trafficking crime. *See* 18 U.S.C. § 924(o); U.S.S.G. §§ 2K2.1, 2X1.1 (2007). To calculate the offense level for this conviction, the district court was required to "cross-reference" Guideline § 2D1.1, which covers trafficking in narcotics. *See* U.S.S.G. § 2K2.1(c) (2007) (establishing "cross-reference" provision when defendant "used or possessed any firearm in connection with the commission or attempted commission of another offense").

**[14]** Guideline § 2D1.1(a) looks to the quantity of drugs involved in the drug-trafficking crime to establish a base offense level. *See* U.S.S.G. § 2D1.1(a)(3) (2007). Section 2D1.1(b) then requires a two-level enhancement to this offense level if "a dangerous weapon (including a firearm) was possessed" in connection with the crime. U.S.S.G. § 2D1.1(b)(1) (2007). Although Briggs was never found with any weapons, the district court applied this two-level enhancement because Briggs "intended to possess a firearm during the drug trafficking crime."

---

[4]Briggs also raises another argument, but it requires little discussion. He challenges the enhancement he received for being an organizer of the conspiracy. The evidence, however, established that Briggs was the point of contact with the undercover federal agents, that he brought together his brother and Mora, and that, to the extent guns were to be involved, he arranged to acquire them. The district court's finding was not clearly erroneous. *See United States v. Rivera*, 527 F.3d 891, 908 (9th Cir. 2008) ("[W]e review for clear error the district court's finding that [the defendant] was an organizer or leader.").

**[15]** The district court's application of this enhancement was error. The enhancement in § 2D1.1(b)(1) may not be applied solely because the defendant planned on using a firearm in connection with a drug-trafficking offense, even though no firearm was possessed. Rather, the plain language of § 2D1.1(b)(1) requires possession of a weapon.

**[16]** The district court did not make any findings of fact concerning whether or not the defendant actually possessed a dangerous weapon in connection with the conspiracy. The defendant repeatedly bragged about the guns he had access to, but none of these firearms was ever recovered. Accordingly, we vacate Briggs' sentence and remand to the district court on an open record on which the government will have the opportunity to prove the facts necessary to support such an enhancement. *See Carty*, 520 F.3d at 993 ("It would be procedural error for a district court to fail to calculate — or to calculate incorrectly — the Guidelines range.").

## IV.

We affirm the district court's denial of Briggs' motion to withdraw his guilty plea and affirm his conviction, but we vacate his sentence and remand for resentencing.

**AFFIRMED in part, VACATED in part, and REMANDED.**