McKEE, Circuit Judge,
concurring in part and dissenting in part.
I agree with the Majority’s thoughtful and persuasive discussion of the discovery and ineffective counsel issues this case presents. I therefore join Part II.A and Part II.C of the Majority Opinion. However, I disagree with my colleagues’ rejection of Washington’s sentencing manipulation claim and his assertion that the mandatory minimum sentence should not apply in these unique circumstances. Accordingly, I must respectfully dissent from Part II.B.
I. Stash-House Sting Operations
Arguably, undercover sting operations, including ones involving fictitious stash houses, can be a valuable investigative tactic for ferreting out those individuals who would otherwise commit crimes in their communities. I also agree that “[cjourts should go very slowly before staking out rules that will deter government agents from the proper performance of their investigative duties.”[1]
However, the potential for abuse and mischief that is endemic to fictitious stash-house stings should not be ignored. The U.S. Court of Appeals for the Fourth Circuit has cautioned that stash-house stings “appear[] highly susceptible to abuse.”[2] The Court of Appeals for the Ninth Circuit is “wary of [stash-house] operations” due to the “the ease with which the government can manipulate ... factors [like drug quantities][.]”[3] The Ninth Circuit specifically warned that one of the problems with such operations is that they ignore questions about whether a planned stash-house robbery is within a defendant’s actual “ambition and means.”[4] Indeed, my colleagues *224 also express reservations about these operations here, even though they ultimately conclude that Washington is not entitled to relief. Moreover, federal courts have noted that such sting operations risk opening the door to the very kind of racial profiling Washington is alleging .here.[5]- All of these problems with stash-house operations have led noted jurist Richard Posner of the Court of Appeals for the Seventh Circuit to conclude, on the whole, that such operations are “a disreputable tactic.”[6]
The facts of this case illustrate 'that these cautions and misgivings are well-founded. This investigation began with- a confidential informant (“Roc”) advising a supervising ATF agent that he knew of an individual (Dwight Berry) who wanted to rob a drug stash house. After Berry -was identified, the ATF embarked upon inventing a scenario that would include weapons, a “crew,” and a mythical quantity of. cocaine that would be the bait for those who would become ensnared in ATF’s trap,
It was the Government, not Berry, that selected cocaine — instead of, for example, marijuana — as the drug of choice for the stash house. Although no cocaine actually existed, the Government decided to' entice targeted individuals with a predetermined quantity of cocaine — 10 kilograms — which was double the amount needed to statutorily trigger the mandatory minimum provisions. We are told that this quantity was necessary in order to portray a “credible” stash house in the Philadelphia region.
After initiating a plan to rob a stash house with Roe and an undercover Agent, Berry presumably enlisted Washington. Washington was a resident of the community whom the confidential informant had not initially targeted, and he was not of any initial interest to the Government based on past criminal activity.
I realize, of course, that even though Washington was just a secondary target, his statements during the planning meetings and subsequent phone conversations show that he was neither a shrinking violet nor reluctant recruit. Rather, Washington was clearly interested in participating and even offered a number of disturbingly violent ideas that he thought would facilitate the planned robbery.
Nevertheless, it comés as no surprise that, “having yielded to an extraordinary inducement [Washington] would do everything possible to earn the promised reward.”[7] According to the Special Agent’s testimony at' trial, a single kilogram of cocaine was worth upwards of $40,000, as *225 Berry (the person who enlisted Washington) no doubt knew.
Despite the Government’s claim that the 10-kilogram quantity was only selected to make the scheme credible, nothing suggests that Washington' was motivated by any knowledge of a specific drug quantity, nor is there any evidence of him having any involvement with stash-house robberies.[8] To the contrary, Washington initially told the group that he did not want to be involved with cocaine. He explained that he “don’t fuck with coke” and that he didn’t “really do this shit.” The Agent understood Washington’s claim that he didn’t “really do this ...” to mean that Washington did not deal in home invasion robberies. Yet, the Agent and Roc forged ahead, greasing the skids to involve Washington in the criminal conspiracy. Washington was ultimately arrested and charged with conspiracy to possess, and attempt to possess, 5 kilograms or more of cocaine with intent to distribute after he carried out the Government-contrived crime.
Despite Washington’s initial statements of disinterest in cocaine and stash-house robberies, I agree that Washington’s ultimate actions do establish his intent to carry out an armed theft of cocaine from a stash house. However, that should not obscure a more fundamental point. As another appellate court has explained, “[t]he risk [of targeting] ... generalized populations [with stash-house investigations] is that the government ... createfe] -a criminal enterprise that would not have come into being but for the temptation of. a big payday, a work of fiction spun..out by government agents to persons vulnerable to such a ploy who would not otherwise have thought of doing such a robbery.”[9]
Here, the Government created a criminal scheme that would not have otherwise existed. Washington had no prior history of stash-house robberies (or violent crimes generally, for that matter), and he expressed reluctance to get involved with cocaine. Thus, here, as in similar cases, there is" a strong possibility that -had Washington not been “fooled into conspiring and attempting to' steal fictitious drugs,”[10] he may well not have been sueked back into the criminal justice system. This is particularly true because he was not-even'the intended target' of this operation. Despite his criminal past, Washington was not necessarily destined to commit future crimes. “Criminals do sometimes change and get their lives back on track,” and," as Judge Posner reminds us, “we don’t want the government pushing [criminals] back into a life of erirtie.”[11],[12]
*226 II. Sentencing in Stash-House Sting Cases
As is all too often the case, not only do stash-house stings risk ensnaring those who might otherwise not have committed crimes, but also the resulting convictions regularly give rise to particularly dubious applications of the Sentencing Guidelines and mandatory minimum sentences. Here, as is typical of these stings, the Government intentionally set the amount of fictitious drugs at a level that substantially increased Washington’s sentencing exposure.
The potential for mischief and abuse is rewarded and encouraged by applying an extraordinarily heavy mandatory sanction that I doubt Congress ever intended to apply where no drugs exist,[13] and where the defendant would not have committed a crime without the government’s assistance. Here, the Government decided to charge Washington with a conspiracy involving 5 kilograms or more of cocaine. As the majority notes, given that quantity, Washington’s prior convictions subjected him to a 20-year mandatory minimum sentence. Accordingly, the District Court concluded that it was required to impose the 20-year mandatory minimum sentence that Washington received.
Surely, sentences should bear some rational relationship to culpability. Otherwise, the entire enterprise of criminal sanctions is reduced to little more than an abstract matrix of numbers and grids. Yet, on this record, there is absolutely nothing to suggest that Washington would not have conspired to rob a stash house containing, for example, a kilogram less than the 5-kilogram mandatory trigger. No mandatory minimum would have “applied” had this trap been baited with the illusion of a stash house containing four kilograms (translating roughly to upwards of $160,000 in value based on the trial testimony) — thereby placing him beyond the reach of the perceived need to impose a 20-year statutory mandatory minimum sentence.[14]
It is worth repeating that Washington had no prior history of robbing stash houses containing any quantity of cocaine (let alone 10 kilograms of it), or any history of committing violent crimes. In addition, as I have noted, he initially -stated that he did not want to get involved with cocaine. Even if we accept the deterrent value of mandatory minimum sentences, it is fanciful to believe that Washington would not have been deterred from future criminal activity had a much shorter period of incarceration been imposed. As Judge Pos- *227 ner has argued in similar circumstances, if a shorter sentence had been imposed, “[could] there be any serious concern that upon emerging [from prison, Washington] would embark on a career of robbing stash houses? That if approached by anyone [subsequently] inviting him to launch such a career he would listen to the person?”[15]1 think not.
My concern is exacerbated by the fact that very few nationally-reported cases of government sting operations or investigations specify any fictional amount of cocaine that is less than the 5 kilograms that triggers this mandatory minimum sentence. Other courts have recognized this problem. For example, the U.S. Court of Appeals for the Second Circuit noted in another stash-house case:
It is unsettling that in this type of reverse sting, the government has a greater than usual ability to influence a defendant’s ultimate Guidelines level and sentence. It appears to be no coincidence that the [government] chose to [use] no less than [the amount of sham cocaine that would trigger as much as 78 more months of imprisonment] ...[16]
In fact, it is usually the government’s initial scripting of the stash-house operations, including the quantity of drugs, that automatically subjects defendants to particular sentences.[17]
It is very troubling that the government can initiate and facilitate criminal conduct, and make strategic choices that result in sentences that have a relationship to culpability that is, at best, tenuous and theoretical. As other courts have observed, in fictitious stash-house stings, “the government has virtually unfettered ability to inflate the amount of drugs” involved — in addition to selecting the type of drugs — “thereby obtaining] a greater sentence for the defendant.”[18] The government can also “minimize the obstacles that a defendant must overcome to obtain the drugs.”[19] Though the District Court here felt compelled to rely on the fanciful quantity the Government selected and to impose the corresponding 20-year mandatory minimum, *228 “the Government assured such a result in advance.by the script that it wrote... -”[20]
My colleagues correctly note that that there was little, if any, countervailing, evidence for the District Court to consider in making .the factual determination that the agents could have used an amount less than 10 kilograms in creating the stash house.[21] The only relevant findings stem from the undercover Agent’s trial testimony that the 10-kilogram amount was selected because that quantity mirrored drug weights typically found in stash houses in Philadelphia. He explained that the proposed scenario had to be realistic, lest robbery crews question the operation’s legitimacy. He also testified that that quantity was based on a consultation’with the Drug Enforcement Agency (presumably the Philadelphia Division), which, he claimed, provides “experts in this information.”[22] Apparently, the DEA is “aware of exactly what was going on ... in the Philadelphia Metropolitan region” and provided the quantity “based on search warrants and investigations that they had conducted.”[23]
Another district court considering a stash-house sting prosecution using 10 kilograms of cocaine was faced with similar government evidence. However, unlike here, that court was able to conclude that “the record [there] [wa]s clear that [the defendant] was ‘in for a penny, in for a pound,’ ”[24] and that the evidence before it had established that the defendant was “ ‘hungry’ enough to pursue-... [the] undertaking regardless of any specific amount of drugs.”[25] That district court explained that “[o]nce the Government established that [the defendant] was willing to engage in an armed robbery of any quantity large enough to resell, its core law enforcement objective was met.”[26] The court cited to the .government’s own testimony that “the street value” of a single kilogram of cocaine was $36,000 and that stolen narcotics - “represent pure profit,” both factors that would seem to make the sting “sufficiently alluring well below 5 kilograms.”[27]
My agreement with the Majority on this specific issue notwithstanding, it is nearly impossible for a defendant to ever rebut the government’s “expert”-based explanation for why a given fictitious quantity is necessary or appropriate. Accepting such testimony * at face value invites the mischief I mentioned" at the outset to drive the sentencing. The district court is also deprived of.its well-established sentencing discretion,[28] a concern compounded by the problems the district court in McLern identified:
The netherworld of criminal activity is .by its very nature opaque. For that rear *229 son, almost out of necessity, law enforcement officers, whose experiences- give them familiarity with that world, are allowed to render certain opinions about use of coded language and street slang. When used in that way, the opinion testimony is interpretive. In stash house sting cases, the Government seeks to make [that opinion testimony] disposi-tive because the charges themselves are the product of opinion testimony as to 1) the amount of cocaine that' would be “expected” to be found in a stash house, and 2) the necessity of specifying substantial amounts to preserve the credibility and safety of the operation. There is a third unstated premise as well — that the targets of the sting would have the same familiarity with the quantity of narcotics stored at the average stash house.
By definition, such opinions are supported only by personal experience, and the dataset, to the extent that one exists, is created by, and only accessible to, law enforcement. There are no peer-reviewed jqurnals within the narcotics trade. There is no way to test the premises on which these sting operations 'are based. None of the traditional means by which expert testimony can be tested in a systematic way apply here, yet courts are expected to accept such opinion as the justification for undercover operations that inexorably and indiscriminately give rise to large mandatory minimum sentences.[29]
I agree.
Thus, regardless of whether a claim of sentencing manipulation is raised, any proffered evidence about the need for a given quantity or type of fictitious drugs deserves a great deal more scrutiny than courts give it.[30] Similarly, requiring evidence ' that a defendant only agreed to participate because of a given quantity or type of drugs seems more than appropriate. Requiring such scrutiny would not eliminate the myriad of problems that pervade these fictitious stash-house stings, but it would at least help minimize the unfairness that can arise from allowing the government to select the drug and the quantity.that will reap the biggest reward at sentencing with little or no fear that a sentencing court would ever question the choices.[31] We should not be “delegat[ing] [sentencing discretion] -all the way down to the individual drug agent operating in the field.”[32]
Scrutinizing the basis for the drug quantity would help restore the alignment between culpability and'punishment that is jettisoned when the government is allowed to control the defendant’s sentencing exposure. “Deeply ingrained in our legal tradition is the idea that the more purposeful is the criminal conduct ... the more severely *230 it ought to be punished.”[33] Absent unique circumstances not evident here, a defendant’s criminal exposure should be linked to actual culpability regarding his/her dealings in specific drug quantities.
Insofar as sentencing manipulation is concerned, “[t]he question is not whether the underlying criminal conviction is lawful, but rather whether there is reason to reduce the sentence due to the inducements used by undercover police or their agents.”[34] Moreover, “a sentence based on an evaluation of a defendant’s culpability for particular offense conduct, which includes a consideration of police inducements,” serves the retributive goals of “proportional and fair punishment,” is “compatible with the consequentialist aims of incapacitation and deterrence,”[35] and is “directly supported by the systemic goal of identifying less blameworthy defendants and mitigating their sentences accordingly.”[36] These fundamental principles of criminal justice necessitate closer scrutiny for schemes that originate with, and are driven by, law enforcement because it is highly unlikely that the Sentencing Guidelines were intended to apply to such circumstances.[37] This scrutiny is appropriate even absent specific evidence that the government “intended” to inflate a defendant’s sentence.[38]
My colleagues discuss our precedent in United States v Twigg[39] in rejecting Washington’s claim that the sentence, that resulted from this scheme is a denial of his constitutional right to due process. I would emphasize, however, that Twigg does not defeat any claim of sentencing manipulation. Indeed, if anything, Twigg strongly suggests that we should recognize some kind of sentencing factor manipulation claim when appropriate. Although, for reasons the Majority explains, the conduct here may not have crossed the due process threshold,[40] I believe Washington’s sen- *231 fencing manipulation claim is more meritorious than the Majority concludes.
III. Sentencing Factor Manipulation and Mandatory Minimum Sentences
The fact that the sentence was mandatory does not necessarily deal a fatal blow to Washington’s sentence manipulation claim. It is difficult to believe that Congress ever considered requiring the imposition of a mandatory minimum sentence where 1) the sentence is tied to a fictitious drug quantity in a criminal endeavor that originates with the government, and 2) the defendant would not have engaged in the criminal conduct but for the government’s prompting and encouragement.
Congress intended for the 10-year mandatory minimum sentences to apply to “major traffickers,”[41] i.e., “manufacturers or the heads of organizations.”[42] The 5-year mandatory minimums were intended to apply to “serious traffickers,” i.e., “managers of the retail level traffic ... in substantial street quantities.”[43] Despite Congress’s intention for mandatory minimums to reflect culpability based on drug quantities, the law instead has, over time, targeted low-level offenders (e.g., street-level dealers and couriers) more often than high-level offenders.[44] For example, in 2009, offenders sentenced for relatively minor roles represented the biggest share of federal drug offenders, while the highest-level traffickers made up a comparatively small share of federal drug offenders.[45] The disconnect is not explained by the fact that there are more low-level dealers than high-level traffickers. The U.S. Sentencing Commission itself concluded in 2011 that “the quantity of drugs involved in an offense is not as closely related to the offender’s function in the offense as perhaps Congress expected.”[46]
*232 Thus, there is no reason to believe that Congress anticipated — much less intended — for quantity-based mandatory minimums to reflexively apply in stash-house cases where, as here, the .defendant is not only a low-level “drug” offender, but also became involved with non-existent drugs at the government’s urging. The circumstances of such phony stings will.rarely lend themselves to a mandatory minimum sentence, or suggest that Congress intended a. mandatory minimum to apply. Concluding otherwise risks both perverting the congressional intent behind the mandatory mínimums and, as I have explained, circumventing federal judges’ traditional sentencing authority.[47]
Moreover, applying mandatory sentences where the criminal conduct and the type and quantity of drugs exist only in the law enforcement’s fertile imagination, rather than an offender’s actual possession, defeats the congressional intent of requiring judges to impose sentences that are guided by the factors in 18 U.S.C. § 3553(a), In United States v. Olhovsky, we stressed that “[18 U.S.C, § ] 3553(a) clearly states that a court must impose a sentence.that is ‘sufficient but not greater than necessary, to comply with the purposes of [sentencing].’ ”[48] We there quoted the Supreme Court’s admonition that this requirement, referred to as “the'parsimony provision,” is 18' U.S.C. § 3553(a)’s “ ‘overarching instruction.’ ”[49]
Despite our conclusion that 21 U.S.C. § 841(b)’s mandatory minimum sentence provision does not conflict with § 3553(a)’s parsimony provision,[50] abandoning the “demand of parsimony that is the overarching instruction of the congressionally mandated sentencing factors”[51] seems an unintended result in phony drug stings. There are no drugs that would otherwise endanger the community, and the criminal conspiracy probably would never have been hatched but for law enforcement’s intervention and direction. Congress could not have intended courts to impose otherwise applicable mandatory minimum sentences — which we have described as “draconian”[52] — where the criminal conduct is the result of the government’s initiative, rather than a defendant’s. I also find it hard to believe that Congress would create exceptions to mandatory minimums that spare actual drug traffickers exposure to *233 draconian sentences[53] . while intending those same harsh sanctions to apply when the government lured a defendant into being involved with drugs that never even existed.
In addressing Congress’s intent, I recognize that there is' no ambiguity on the face of the mandatory minimum sentencing statute. 21 U.S.C. § 841(b)(1) does not distinguish between roles in a narcotics conspiracy, nor does it require that drugs actually exist.[54] That is not surprising, as it would have taken something approaching clairvoyance for Congress to foresee that these severe sentences would extend to situations where drugs were not actually involved. In any event, it is, "of course, axiomatic that “[w]hen Congress establishes a minimum sentence for a particular crime, district courts are required to sentence defendants guilty of that crime to a term of imprisonment no less than the Congressionally prescribed minimum, unless an explicit exception to the minimum sentence applies.”[55] But as the U.S. Court of Appeals for the Eleventh Circuit explained, “[c]onceptually, ... an adjustment for sentencing factor manipulation is not a departure” that the mandatory minimum statute would otherwise forbid.[56] This is because “[w]hen a court filters the manipulation out of the sentencing calculus before applying a sentencing provision, no mandatory minimum would arise' in the first place.”[57]
Ironically, it may well be the lay testimony of Rashida Clover, Washington’s sister and former caretaker, that best expresses the' arbitrariness of applying the mandatory sentence where the government initiates the crime and no drugs áre involved. At Washington’s sentencing hearing, she remarked;
20 years? My brother ... [has] already spent half of his life in jail. .., That’s not doing anything. ... It’s not rehabilitating him. ... What he needs is education and an opportunity. ... I understand that [the District Court has] guidelines to go by,- but ... I can’t imagine that ;.. [the] Guideline book said ... to go out and entrap young men who are not organized in organized crime and sentence people for fake drugs and put their own limitations on the amount of the drugs just to give them a [minimum] 20 years sentence or *234 more.... I hardly think whoever created that book meant for this to happen. I feel like the system is being manipulated by that. And it’s ... embarrassing and it’s hurtful because a lot of people are being affected by this. This is not just my brother... .This is about a lot of people in our communities that are affected by this. They really are.[58]
I agree that applying mandatory minimum sentences in cases where no drugs exist and the government originates and perpetuates the criminal activity creates such an unfair and irrational divergence between culpability and conduct that Congress could hardly have intended the result.
IV. Conclusion
This case is the latest illustration of why federal courts across the country continue to find the government’s reliance on phony stash-house sting operations disturbing. As I have explained, these cases raise serious issues of fairness while destroying the fundamental relationship between culpability and punishment that is so important to sentencing. The conduct being sanctioned is the direct result of the government’s initiative rather than the defendant’s.
I reiterate that it is exceedingly difficult to conclude that Congress ever considered that mandatory minimum sentences would apply here. Nevertheless, it just may be that the ultimate systematic resolution of this very troublesome approach to sentencing will have to await clarification by Congress, the Sentencing Commission,[59] or the U.S. Supreme Court. Meanwhile, it is worth echoing my colleagues’ caution: The Government’s success today should not be interpreted as a clue that “all such prosecutions will share the same fate” in the future.[60]
Hopefully, this problem will be resolved by one of the authorities I have just mentioned. Until that day comes, we are left with the very poignant observation of Ms. Clover, who has experienced our sentencing laws “up close and personal.” As quoted earlier, she was skeptical that “whoever created that [Sentencing Guidelines] book meant for this to happen,” and that “the system is being manipulated by that.”[61] She added that it is “embarrassing and it’s hurtful because a lot of people are being affected by this.”[62] And so they are.

. United States v. Montoya, 62 F.3d 1, 3 (1st Cir. 1995) (citation omitted).

. United States v. Hare, 820 F.3d 93, 103-04 (4th Cir. 2016), cert. denied, - U.S. -, 137 S.Ct. 224, 196 L.Ed.2d 173 (2016), reh’g denied, — U.S. -, 137 S.Ct. 460, 196 L.Ed.2d 338 (2016).

. United States v. Briggs, 623 F.3d 724, 730 (9th Cir. 2010).

. Id.

.In 2013, for example, Chief Judge Ruben Castillo of the U.S. District Court for the Northern District of Illinois ordered the disclosure of prosecutorial records after defense attorneys filed for discovery. The defense attorneys argued that since 2011, all of the stash-house targets charged in Chicago’s federal courts had been minorities — 19 African-American and seven Latino defendants. Chief Judge Castillo ordered discovery "on the sensitive issue of potential racial profiling”, after concluding that "the defendants ha[d] made a strong showing of potential bias in the history of the prosecution of 'phony drug stash house rip off cases.’ ” Order, United States v. Brown, No. 12-cr-632, ECF No. 153, at 1 (N.D, Ill, July 31, 2013). Other district courts also have ordered discovery into the basis for ATF and federal prosecutors identifying suspects for investigation. See Maj. Op. at 218 n.112.

. See, e.g., United States v. Kindle, 698 F.3d 401, 414 (7th Cir. 2012) (Posner, J., dissenting) (criticizing that "[l]aw enforcement uses ' [such stings] to increase the amount of drugs that can be attributed to the persons stung, so as' to jack up their sentences”), reh’g en banc granted, opinion vacated (Jan, 16, 2013), on reh’g en banc sub nom. United States v. Mayfield, 771 F.3d 417 (7th Cir. 2014).

. See, e.g., Kindle, 698 F.3d at 415 (Posner, J,, dissenting).

. The Agent had only told Berry that he saw over 10 kilograms of cocaine inside a cooler when the two men met.- The District Court makes no finding that Berry then told Washington of the exact quantity of drugs to be obtained in a potential stash-house robbery before Washington joined the initial planning meeting.

. United States v. Black, 733 F.3d 294, 303 (9th Cir. 2013).

. United States v. Yuman-Hernandez, 712 F.3d 471, 474 (9th Cir. 2013).

. Kindle, 698 F.3d at 415-16 (Posner, J., dissenting).
As I suggested earlier, given Washington's statements during this scheme,' he is not the best example of someone being lured into criminality who may otherwise have continued restoring his life in the community, None-' theless, he still had the support of a family, and at the sentencing hearing, his loved ones told the court that Washington, after serving time for his first conviction, was "out doing the right thing .;. doing really good, " having, for example, acquired his own business and taking children in tlte community to baseball games. Sentencing Tr, 36. His mother stated: "He was doing a lot of good things and how he got caught up in that situation is beyond me.” Id.
*226 His statements during the scheme notwithstanding, concerns that have been expressed about fictitious stash-house schemes are no less valid. The tactic still is troubling.

.See Alfred Blumstein and Kiminori Naka-mura, Redemption in the Presence of Widespread Criminal Background Checks, 47 Criminology 327, 327-59 (2009) ("Recidivism probability declines with time ‘clean,’ so some point in time is reached when a person with a criminal record, who remained free of further contact with the criminal justice system, is of no greater risk than a counterpart of the same age [who has no criminal record]. ...”).

. See infra Part III for a discussion of what, ostensibly, were Congress’s original intentions for tying mandatory mínimums to specific drug quantities.

. I recognize that the 5-kilogram cutoff is equally arbitrary when defendants are sentenced for a quantity of drugs that actually exists. Some degree of arbitrariness may be necessary to any sentencing scheme, and this is no less true when sentencing ranges are largely determined by artificially constructed Federal Sentencing Guidelines ranges. However, that practical reality does not minimize or negate the very real issues of unfairness and the potential for sentencing manipulation in these kinds of cases.

. Kindle, 698 F.3d at 416 (Posner, J., dissenting) (criticizing the’ fact that the defendant in that stash-house case was imprisoned for 27 years — and proposing that a sentence of 5 years was "more than adequate,” in part because, as a result of the sting, "taxpayers w[ould] be supporting [the defendant] at considerable expense for the next quarter century”).

. United States v. Caban, 173 F.3d 89, 93 (2d Cir. 1999) (recognizing the defendant’s argument as one paralleling sentence manipulation but concluding that the status of the doctrine at the time was unclear).

. It is also the government's initial scripting of the type of drugs that bears on mandatory minimum sentencing. When asked about choosing that drug for the sting operation in this case, the Government witness described stash-house stings as a “technique ,,. developed in the 1980s in response to a trend,” and that “[m]any of the robbery crews .,. specifically target houses where cocaine is stored.” Trial Tr. 82-83. Therefore, “[the sting operation] has to be realistic” and "mirror what’s really going on in the. streets for them to believe it and for our safety.” Id. at 83. The witness explained that “when you’re talking about the operation of a stash house, cocaine lends itself ... as opposed to say another drug like marijuana where — if you're talking about a large scale, typically you're talking about a grow house or something like that.” Id.
As discussed, infra, however, my concerns about the degree to which such street-informed testimony can be tested leave me doubting whether the government must use cocaine to achieve its law enforcement objectives. Here, for example, Berry expressed only a general interest in robbing a drug stash house without regard for a specific type.

. United States v. Briggs, 623 F.3d 724, 729 (9th Cir. 2010).

. Id. at 730.

. United States v. McLean, 199 F.Supp.3d 926, 939 (E.D. Pa. 2016).

. While it was ultimately the 5 kilograms of cocaine that the Superseding Indictment charged that drove Washington’s 20-year mandatory minimum, the amount the Gov-ermpent selected allowed it to charge Washington with conspiring to rob 5 kilograms or more, and thereby trigger the mandatory minimum,

. Trial Tr, 85.

. Id,

. McLean, 199 F.Supp.3d at 935.

. Id. at 938.

. Id. at 935.

. Id. at 937.

. See, e.g., Mistretta v. United States, 488 U.S. 361, 390, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989) (discussing the Sentencing Guidelines and Congress’s “strong feeling that sentencing has been and should remain primarily a judicial function” (internal quotation marks omitted)).

. Id. at 936-37.

. Here, the District Court did not probe the testimony, which, as the Majority notes, it certainly was free to do. Maj. Op. at 212 n,73. As the Majority further suggests,' had there been more fact-finding by the District Court on this issue, some deference to the testimony about the drug quantity may have been appropriate. Id. at 212-13 n.78.

. To accept, wholesale, the unsubstantiated , rationale that a fictitious quantity of drugs matches what is "realistic” in á particular geographic region 'also suggests that defendants across the United States could theoretically be subjected to mandatory minimum sentences if the stash-house drug quantities allowing for such -a sentence happen to be "realistic” for those geographic areas, as they apparently are in Philadelphia.

,United States v. Staufer, 38 F.3d 1103, 1107 (9th Cir. 1994).

. Tison v. Arizona, 481 U.S. 137, 156, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987).

. Eda Katharine Tinto, Undercover Policing, Overstated Culpability, 34 Cardozo L. Rev. 1401, 1454(2013).

. Id. at 1418 (emphasis added).

. Id. at 1420.

. See infra Part III.

. See Tinto, supra n.34 at 1426 (concluding that "in the context of a sentencing claim, the requirement of an improper [police] motive ignores the needed link between the police conduct and the justification for a reduction in sentence” because "[rjegardless of whether police officers are explicitly making strategic choices based on sentencing laws (and the desire to increase a suspect's sentence), the motivation for the law enforcement conduct or the inducements used may or may not be relevant from the perspective of assessing the defendant's culpability”).

. 588 F.2d 373 (3d Cir. 1978).

.I disagree with the Majority’s suggestion that Washington has not shown prejudice because Washington’s ultimate sentence was significantly below the recommended Sentencing Guidelines range. The Majority, itself, concludes that the District Court was “clearly guided by the mandatory minimum term on the drug counts in crafting the overall sentence.” Maj. Op. at 209 n.55. The District Court never mentioned whether; or the extent to which, it may have departed from the recommended Sentencing Guidelines range had it not been required to impose a sentence of at least 20 years.
Neither do I find persuasive the distinction the Majority maltes between this case and McLean, to the extent that Washington could rely on that case for whatever persuasive value it may have for his due process argument. The Majority, for example, discusses that the defendant in McLean received a "split” jury verdict on the amount of cocaine involved (5 kilograms with regard to conspiracy but 500 grams with regard to attempt) and that there was "no equivalent ambiguity” in the jury's verdict for Washington here. But that jury finding, while it highlighted the' "inherent *231 problems” these prosecutions presented for the district court, McLean, 199 F.Supp.3d at 939, was not one of the "factors” that led the court to conclude that enforcing the mandatory minimum would "offend due process.” Id. at 943. Regardless of any "ambiguity,” the jury in McLean still found the defendant guilty of conspiring to possess 5 kilograms or more of cocaine which, "absent some constitutional prohibition,” purportedly "bound” the district court — like the District Court here — to a mandatory minimum sentence. Id. at 938.

. U.S. Sentencing Comm’n, Special Report to the Congress: Cocaine and Federal Sentencing Policy, 119 (1995).

. H.R. Rep. No. 99-845, 99th Cong., 2d Sess. 1986, 1986 WL 295596; see also 132 Cong. Rec. 27, 193-94 (daily ed. Sept. 30, 1996); 132 Cong. Rec. 22, 993 (daily ed. Sept. 11, 1986).

. Id.

. U.S. Sentencing Comm’n, Report to the Congress: Mandatory Minimum Penalties in the Federal Criminal Justice System, Appendix D, Figure D-22, available at https://www.ussc. gov/sites/default/files/pdf/news/congressional-testimony-and-reports/mandatory-minimum-penalties/20111031 -rtc-pdf/Appendix_D.pdf;' see U.S. Sentencing Comm’n, Special Report to the Congress: Cocaine and Federal Sentencing Policy, 20-21, 85 (May 2007). See also Deborah Young, Rethinking the Commission's Drug Guidelines: Courier Cases where Quantity Overstates Culpability, 3 Fed. Sent. Rptr. 63 (1990) (tracking the disproportionate severity of quantity-based penalties for lower-level drug offenders and further observing that the quantity-based Sentencing Guidelines often apply to defendants less culpable than the key drug players, who are the “primary targets of the laws”).

. U.S. Sentencing Comm’n, Report to the Congress: Mandatory Minimum Penalties in the Federal Criminal Justice System (October 2011), Appendix D, Figure D-22, available at https://www.ussc.gov/sites/default/files/pdf/ news/congressional-testimony-and-reports/ mandatory-minimum-penalties/20111031-rtc-pdfMppendix_D.pdf.

. U.S. Sentencing Comm’n, Report to the Congress: Mandatory Minimum Penalties in the Federal Criminal Justice System, 350, (Oc *232 tober 2011) available at https://www.ussc.gov/ sites/defaull/files/pdf/news/congression al-tes-timony-and-reports/mandatory-minimum-pen-alties/?011103 l-rtc-pdf/Chapter_12.pdf,

, My discussion is limited to sentences imposed as punishment for involvement in a phony stash-house sting. I do not intend to suggest that a sentence designed primarily to incapacitate is necessarily inappropriate. Such sentences may be necessary for the protection of the community in rare circumstances. However, phony stash-house stings will rarely, if ever, present a court with such circumstances, and when they do, I have every confidence that the district court will sentence accordingly.

. 562 F.3d 530, 547 (3d Cir. 2009), as amended (May 5, 2009).

. Id. at 548 (quoting Kimbrough v. United States, 552 U.S, 85, 111, 128 S.Ct. 558, 169 L,Ed.2d 481 (2007)).

. See, e.g., United States v. Walker, 473 F.3d 71, 85 (3d Cir. 2007) (finding'that there is no conflict between § 3553' and a 'mandatory minimum sentence provision because "§ 3553(a) must be read in conjunction with [] § 3553(e), which prohibits courts from sentencing a defendant below the statutory mandatory minimum sentence unless the Government files a motion permitting such departure”).

, Olhovsky, 562 F.3d at 548 (internal quotation marks omitted).

. See United States v. Williams, 299 F.3d 250, 258 (3d Cir. 2002).

. In Williams, we addressed one of those exceptions — Congress’s enactment of the “safety valve" in 18 U.S.C. § 3553(f). Id, It is not surprising that Congress did not include situations such as phony stash-house stings in the statutory exceptions for applying mandatory minimum sentences; Congress likely never contemplated that situation. Williams accurately characterizes the lengths of mandatory minimums as “draconian," and exceptions like 18 U.S.C. § 3553(f)’s safety valve, and § 3553(e) (granting authority upon government motion), at minimum, evince Congress’s intention that the mandatory sentences need not always be imposed.

. As the Government points out, there are only two circumstances under which a district court can depart downward from a statutorily authorized mandatory minimum sentence: the government must file a motion to recognize the defendant’s “substantial assistance,” or the defendant must fall within the provisions of the "safety valve” embodied in 18 U.S.C. § 3553(f). See, e.g., United States v. Kellum, 356 F.3d 285, 289 (3d Cir. 2004).

. United States v. Winebarger, 664 F.3d 388, 392 (3d Cir. 2011); see also United States v. Reevey, 631 F.3d 110, 113 (3d Cir. 2010) (stating that the "exceptions are the only authority a. district court has to depart below a mandatory minimum" (quoting Kellum, 356 F.3d at 289)).

. United States v. Ciszkowski, 492 F.3d 1264, 1270 (11th Cir. 2007).

. Id.

. Sentencing Tr. 36.

. The Sentencing Commission has already "recognized the potential for government agents to use their knowledge of the Sentencing Guidelines to manipulate the quantity of drugs sold in a reverse sting in order to increase a defendant’s sentence.” United States v. Stavig, 80 F.3d 1241, 1245-46 (8th Cir. 1996) (discussing how under Application Note 17 of U.S.S.G. § 2Dl.l(b)(17), a district court can depart downward when law enforcement agents set a price below market that allows the defendant to purchase a significantly larger quantity of drugs, and that Application Note 12 of § 2D 1.1 instructs a district court to remove from the sentencing calculation the amount that a defendant is unable to produce if the produced amount is less than negotiated). The provisions of tire Sentencing Guidelines in place “show[] that the Sentencing Commission is aware of the unfairness and arbitrariness of allowing drug enforcement agents to put unwarranted pressure on a defendant in order to increase his or her sentence without regard for his predisposition, his capacity to commit the crime on his own, and the extent of his culpability.” United States v. Staufer, 38 F.3d 1103, 1107 (9th Cir. 1994). But the "Sentencing Commission’s determination that the defendant may receive a downward departure when the government artificially lowers the price of the drugs ... only addresses one of the ways in which drug enforcement agents are able to manipulate sentences.” Id.

. Maj. Op. at 213.

. Sentencing Tr. 36.

. Id.